1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
RENÉ I. GAMBOA, State Bar No. 136166
2      E-Mail: Rene.Gamboa@lewisbrisbois.com
333 Bush Street, Suite 1100
3  San Francisco, California 94104-2872
Telephone: 415.362.2580
4  Facsimile: 415.434.0882

5  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
JEFFREY H. KASS, pro hac vice application pending
6      E-Mail: jeffrey.kass@lewisbrisbois.com
Robin E. Alexander, pro hac vice application pending
7      E-Mail: robin.alexander@lewisbrisbois.com
1700 Lincoln Street, Suite 4000
8  Denver, Colorado 80203
Telephone: 720.292.2026
9

Attorneys for Plaintiff,
10  QUIBY INC., d/b/a KICKFURTHER

11

12                    UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

14

15  OUIBY INC., d/b/a KICKFURTHER          Case No._____

16          Plaintiff                     **COMPLAINT**

17  v.                                    **(JURY DEMAND)**

18  IDIL DOGUOGLU-POSEY, CARL POSEY        Trial Date:      None Set
PHOTOGRAPHY, INC., CARL POSEY
19

20          Defendants.

21

22          Plaintiff Ouiby Inc., d/b/a Kickfurther ("Kickfurther"), by its attorneys Lewis Brisbois

23  Bisgaard & Smith LLP, and for its Complaint against Defendants Idil Doguoglu-Posey, Carl Posey

24  Photography Incorporated and Carl Posey (collectively "Defendants"), alleges and states as follows:

25                        **NATURE OF THE ACTION**

26          1.      Kickfurther hosts an online marketplace that provides businesses with a way to fund

27  their inventory needs by aggregating financing from members of the public.

28

2.      Defendants Idil Doguoglu-Posey and Carl Posey are a married couple who own a photography company and also claim to be in the business of producing several clothing lines and a line of chocolate for the consuming public.  Beginning in the summer of 2016, Defendants began contacting Kickfurther seeking funding for inventory.

3.      On October 12, 2016, December 8, 2016, and January 31, 2017, respectively, Kickfurther and Defendants entered into three contracts (collectively, the "Consignment Agreements"), under which Kickfurther provided funding for the inventory of three companies: (1) Carol Posey Photography Incorporated; (2) Tripple Red Corp., d/b/a Antidote Chocolate ("Antidote Chocolate"); and (3) Walking Candy, Inc. d/b/a Elastic Wonder ("Elastic Wonder").

4.      Prior to entering the Consignment Agreements, Defendants made multiple fraudulent representations to Kickfurther as set forth below in order to induce Kickfurther to provide them with funding.

5.      Defendants' fraudulent scheme involved falsely claiming to represent Antidote Chocolate and Elastic Wonder, falsely impersonating one of their former business associates, Mr. Sabudh Nath ("Mr. Nath"), and falsely impersonating a former acquaintance, Ms. Red R. Thalhammer ("Ms. Thalhammer").

## THE PARTIES

6.      Plaintiff Kickfurther is a corporation organized and existing under the laws of Delaware with its principal place of business at 311 Mapleton Avenue, Suite 231, Boulder, Colorado 80304.

7.      Defendant Carl Posey Photography Incorporated is a corporation organized and existing under the laws of New Jersey with its principal place of business at 341 Grove Street, 4th FL, Jersey City, New Jersey 07302.  Defendant Carl Posey Photography Incorporated also conducts a substantial portion of its business in California.

1

2

8.      Defendant Idil Doguoglu-Posey is a citizen of California, residing in Oakland, California.  Defendant Idil Doguoglu-Posey is married to and is a business partner of Defendant Carl Posey.  Defendant Idil Doguoglu-Posey is also a representative of Defendant Carl Posey Photography Incorporated.

3

4

5

6

9.      Defendant Carl Posey is a citizen of California, residing in Oakland, California.  Defendant Carl Posey is married to and is a business partner of Defendant Idil Doguoglu-Posey.  Defendant Carl Posey is a professional photographer and a founder and owner of Defendant Carl Posey Photography Incorporated.

7

8

9

10

## AGENTS

11

10.      The acts of Defendants alleged in this Complaint were authorized, ordered, or done by themselves, their agents, or representatives while actively engaged in the management and operation of Defendants' businesses or affairs.

12

13

14

11.      Each Defendant acted as the principal or agent for the other participants in the fraud alleged herein in which they participated.

15

16

17

## JURISDICTION AND VENUE

18

12.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship among the Parties and the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000).

19

20

21

13.      This Court has personal jurisdiction over Defendants because they are located in this District.  Furthermore, Defendants have deliberately engaged in significant and continuous business activities within the Northern District of California and Defendants have sent and made numerous fraudulent statements within the Northern District of California.  Accordingly, Defendants have established minimum contacts with the Northern District of California.

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants reside in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.  Venue is proper in this District, because one or more of Defendants reside in this District, and the claims for relief arose in this District.

## FACTUAL BACKGROUND

## KICKFURTHER

15. Kickfurther, founded in 2014, hosts an online marketplace at <www.kickfurther.com> that provides businesses with a way to fund their inventory needs by aggregating financing from a crowd of Kickfurther supporters ("Supporters").

16. To become Supporters, members of the public register on Kickfurther's website, thereby agreeing to Kickfurther's Terms of Use and User Agreement.

17. Businesses seeking inventory financing post "consignment opportunities" to the Kickfurther website.  The postings for the consignment opportunities specify the consignment inventory goal amount, the consignment profit that Supporters will earn as inventory is sold, and the estimated time it will take to sell the inventory based on the prior sales history of the business.

18. Supporters browse consignment opportunities and pledge to the opportunity of their choice.

19. In the event that the consignment inventory goal is reached, the Supporters are charged by Kickfurther for their pledge amount.

20. Supporters agree that Kickfurther will represent them as their agent to aggregate their contributions and negotiate a consignment agreement with the business according to the terms of the consignment opportunity as stated on Kickfurther's website.

21. As the business sells the inventory, it is obligated to provide Kickfurther with payment for such sales, and Kickfurther distributes these payments among the Supporters.

22.     Defendants hold themselves out to the public as owners of a photography company and also as being in the business of producing several clothing lines and a chocolate line for the consuming public.  Beginning in the summer of 2016, Defendants began contacting Kickfurther seeking to advertise consignment opportunities on the Kickfurther platform for the inventory needs of three companies: (1) Carol Posey Photography Incorporated; (2) Antidote Chocolate; and (3) Elastic Wonder.

## CARL POSEY PHOTOGRAPHY INCORPORATED

23.     In August of 2016, Defendants contacted Kickfurther seeking to advertise a consignment opportunity on the Kickfurther platform inviting Supporters to purchase the inventory for a clothing line of t-shirts and skirts that Defendants intended to produce.  These products were designed by Defendant Idil Doguoglu-Posey and featured the artwork of Defendant Carl Posey.

24.     In order to receive approval from Kickfurther to advertise the consignment opportunity, Defendants created an account on the Kickfurther platform for Defendant Carl Posey Photography Incorporated, supplied documentation concerning the business and its inventory needs, and submitted a personal credit check on behalf of Defendant Carl Posey.

25.     Knowing that a central basis of Kickfurther's decision to enter into a consignment agreement with Defendants would be Defendants' credit worthiness and business history, Defendants made multiple fraudulent misrepresentations, as set forth herein, with the intent to induce Kickfurther into providing them with funding.

26.     On August 17, 2016, in an email to Kickfurther, Defendants claimed that Defendant Carl Posey's credit score was low due to some issues that he had during the economic downturn, but that his business was "solid now and he has plenty of assets in his photo archive…"

27.     In emails to Kickfurther in September of 2016, Defendants also represented that Defendant Idil Doguoglu-Posey was a business partner of Defendant Carl Posey Incorporated and that

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

the cooperative opportunity was associated with Defendant Idil Doguoglu-Posey's clothing company Elastic Wonder, which was in good economic condition.  Defendant Idil Doguoglu-Posey further claimed that she was the rightful owner of the U.S. trademark registration for the stylized logo of Elastic Wonder.

28.     On October 12, 2016, Defendant Carl Posey Photography Incorporated entered into a formal consignment agreement with Kickfurther.  A true and accurate copy of the Carl Posey Photography Incorporated Consignment Agreement (the "CP Consignment Agreement"), signed by Carl Posey, is attached hereto as Exhibit A.

29.     Pursuant to the CP Consignment Agreement, Defendants used the Kickfurther platform to raise a total of forty-four thousand three hundred fifty-two  dollars ($44,352.00).

## ANTIDOTE CHOCOLATE

30.     In the fall of 2016, Defendants again contacted Kickfurther asking to post a consignment opportunity on the platform inviting Supporters to purchase inventory for a brand named Antidote Chocolate.

31.     Knowing that a central basis of Kickfurther's decision to enter into a consignment agreement with Defendants would be the reputation of the business and its owners, Defendants made multiple fraudulent representations, as set forth herein, with the intent to induce Kickfurther into providing them with funding.

32.     Prior to Kickfurther agreeing to provide Defendants with funding, Defendants sent emails to Kickfurther impersonating Mr. Nath and claiming to be representatives of Antidote Chocolate.  Defendants accomplished this by creating false email addresses for Mr. Nath, including the email address <antidotechoco@yahoo.com>.

33.     In addition, Defendants also secured and registered the domain name <www.antidotechoc.com> and provided the link to Kickfurther and its Supporter to provide them with background about Antidote Chocolate.

34.     Defendants also submitted documentation containing Mr. Nath's personal information, including his social security number, to Kickfurther to allow Kickfurther to obtain business and consumer credit reports and conduct other due diligence on Mr. Nath.

35.     On December 8, 2016, Defendants entered into a formal consignment agreement with Kickfurther.  A true and accurate copy of the Antidote Chocolate Consignment Agreement (the "AC Consignment Agreement"), with Mr. Nath's forged signature, is attached hereto as Exhibit B.

36.     Pursuant to Section 1.3 of the AC Consignment Agreement, Defendants agreed to use the Kickfurther platform to raise a total of eighty-seven thousand four hundred and fifty dollars ($87,450) for the purchase of inventory.

## ELASTIC WONDER

37.     In January of 2017, Defendants again contacted Kickfurther asking to advertise a consignment opportunity, inviting Supporters to purchase the inventory for a spandex clothing line they planned to produce on behalf of Elastic Wonder.

38.     Thereafter, Kickfurther communicated to Defendant Idil Doguoglu-Posey that it was unwilling to post the proposed consignment opportunity because of her involvement in other ongoing consignment agreements, unless a number of conditions were met.  These conditions included, but were not limited to, the President of Elastic Wonder agreeing to execute a promissory note for any money provided by Kickfurther.

39.     Knowing that a central basis of Kickfurther's decision to enter into a consignment agreement with Defendants would be the reputation and credit worthiness of the business owners,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   Defendants made multiple fraudulent representations, with the intent to induce Kickfurther to provide

2   them with funding.

3          40.     Prior to entering into this additional contract with Kickfurther, Defendant Idil

4   Doguoglu-Posey claimed to be a principal of Elastic Wonder and to own the Elastic Wonder

5   trademark.

6

7          41.     Defendants also communicated with Kickfurther impersonating Mr. Nath and claiming

8   to be the President of Elastic Wonder.  Defendants accomplished this by creating false email addresses

9   for Mr. Nath, including the email address <sabu@elasticwonder.com>.

10         42.     Prior to entering into this contract with Kickfurther, Defendants also used Mr. Nath's

11  falsely obtained personal information to submit a credit check on his behalf to Kickfurther.

12         43.     On January 31, 2017,  Defendants entered into a formal consignment agreement with

13  Kickfurther.  A true and accurate copy of the Walking Candy, Inc. Consignment Agreement (the "WC

14  Consignment Agreement"), with Mr. Nath's forged signature, is attached hereto as Exhibit C.

15

16         44.     The WC Consignment Agreement included a promissory note that Defendants claimed

17  was executed by Mr. Nath, guaranteeing Kickfurther payment if Elastic Wonder defaulted on the WC

18  Consignment Agreement.   In reality, Defendants had also forged Mr. Nath's signature on the

19  promissory note.  A true and accurate copy of the promissory note, with Mr. Nath's forged signature,

20  is attached hereto as Exhibit D.

21

22         45.     Pursuant to Section 1.3 of the WC Consignment Agreement, Defendants used the

23  Kickfurther platform to raise a total of one hundred and seventy-five thousand nine hundred and

24  twenty-five dollars ($175,925) for the purchase of inventory.

25                                **CONSIGNMENT AGREEMENT TERMS**

26         46.     After the Consignment Agreements were executed, Kickfurther provided Defendants

27  with money to purchase the consignment inventory identified therein.  Specifically, pursuant to the CP

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Consignment Agreement, on October 23, 2016 Kickfurther provided Defendants with forty-two thousand and eight hundred dollars ($42, 800).   Pursuant to the AC Consignment Agreement, on December 17, 2016 Kickfurther provided Defendants with eighty-four thousand and forty dollars ($84,040).   Lastly pursuant to the WC Consignment Agreement, on February 10, 2017 Kickfurther provided Defendants with one installment of eighty-five thousand dollars ($85,000).

47.     Pursuant to Section 5 of each Consignment Agreement, Defendants agreed to accept possession of the consignment inventory on behalf of Kickfurther and agreed that the title of the consignment inventory, or its proceeds, would remain the property of, and vest in, Kickfurther.

48.     Pursuant to Section 7 of each Consignment Agreement, Kickfurther granted Defendants the right to offer and sell the inventory on behalf of Kickfurther.

49.     In exchange, pursuant to Section 9.2 of each Consignment Agreement, Defendants agreed to pay Kickfurther the "Revenue Share Price" set forth in Exhibit A of each Consignment Agreement for each item of inventory sold until Kickfurther had been paid the total consignment value of the inventory.

50.     The total consignment value of the inventory under the CP Consignment Agreement was forty-eight thousand seven hundred and eighty-seven dollars and fifty-six cents ($48, 787.56). The total consignment value of the inventory under the AC Consignment Agreement was ninety-seven thousand nine hundred and forty-four dollars and sixty-four cents ($97,944.64).   The total consignment value of the inventory under the WC Consignment Agreement was one hundred and eighty-six thousand eight hundred and ninety-two dollars and sixty cents ($186,892.60).

51.     Pursuant to Section 9.3 of each Consignment Agreement, Defendants agreed to pay Kickfurther for items of inventory sold on the dates specified in Exhibit B of each Consignment Agreement and agreed to continue to provide such payments to Kickfurther for inventory sold until such time as their payment obligations were fully satisfied.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

52.     Pursuant to Section 6 of each Consignment Agreement, Defendants agreed to reimburse Kickfurther, for all losses and expenses, including but not limited to, reasonable attorney's fees and expenses, resulting from damage to, theft of, or loss of the consignment inventory.

53.     Pursuant to Section 12.2 of each Consignment Agreement, Defendants agreed that Kickfurther could terminate the Consignment Agreement prior to Defendants' payment of the total consignment value of the inventory upon Kickfurther's written notice to Defendants.  Upon receiving such notice from Kickfurther, Defendants agreed to return all of the consignment inventory to the location designated by Kickfurther within fifteen (15) business days.  Importantly, the termination of the Consignment Agreements did not effect the obligation of Defendants to pay all amounts specified in the Consignment Agreements, including the sums owed for any unreturned consignment inventory.

54.     Pursuant to Section 14.5.2 of each Consignment Agreement, Defendants agreed that if it was determined by a court of law that Defendants made any knowingly false statements to Kickfurther, or made any knowingly false statements on Kickfurther's site or to Kickfurther's Supporters, or attempted to defraud Kickfurther or Kickfurther's Supporters, that the Defendants would pay Kickfurther the sum of two-hundred and fifty thousand dollars ($250,000) for each breach, as liquidated damages in addition to being bound by any promissory note created as a function of that Consignment Agreement.

**KICKFURTHER UNCOVERS DEFENDANTS' FRAUDULENT ACTIVITY**

55.     On or about February 21, 2017, Kickfurther attempted to transfer the remainder of the funds due under the WC Consignment Agreement to Elastic Wonder but was unable to do so because the account designated for payment was a personal checking account for Defendant Idil Doguoglu-Posey.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

56.     Due to the promissory note executed by Mr. Nath, Kickfurther informed Defendants that Kickfurther representatives would have to communicate with Mr. Nath directly before Kickfurther would make a payment to any account not controlled by Elastic Wonder or Mr. Nath.

57.     Thereafter, Defendants sent multiple emails to Kickfurther impersonating Mr. Nath and directing payment to Defendant Idil Doguoglu-Posey's personal checking account.   Defendants included a copy of Mr. Nath's driver's license in one such email.

58.     Kickfurther representatives asked to speak with Mr. Nath by phone and were notified by Defendant Idil Doguoglu-Posey that Mr. Nath was out of the country and communication by phone would be problematic.

59.     Subsequently, Kickfurther's Chief Marketing Officer received several telephone messages at early morning hours, usually between 1:00 AM and 2:00 AM, from an individual purporting to be Mr. Nath.   This individual did not leave contact information, which made it impossible for Kickfurther's Chief Marketing Officer to return his calls.

60.     Kickfurther representatives became suspicious of Defendants' hesitancy to allow them to speak to Mr. Nath and decided to investigate.

61.     On or about March 1, 2017, Kickfurther was able to identify and contact the real Mr. Nath.  Mr. Nath was not out of the country as Defendants claimed but was in New York, New York.

62.     Mr. Nath confirmed he is the sole owner and President of  Elastic Wonder but said he had no affiliation with Antidote Chocolate.

63.     Mr. Nath had no knowledge of any business dealings or communications with Kickfurther.   Mr. Nath had not authorized Defendants to use his personal information to enter transactions with Kickfurther.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

64.     Mr. Nath also provided that in the fall of 2012, he began developing the business Elastic Wonder. Thereafter, Mr. Nath incorporated Walking Candy, Inc., d/b/a Elastic Wonder and registered the trademark ELASTIC WONDER.

65.     To assist him in this new venture, on January 6, 2013, Mr. Nath retained the Defendants to assist him in developing his business.

66.      Defendants' responsibilities included designing garments, obtaining a domain name for Mr. Nath, setting up a website at the domain name, and establishing a PayPal account.

67.     Acting on Mr. Nath's behalf, Defendants secured and registered the domain name <www.elasticwonder.com>.  Mr. Nath paid the registration fee.  However, unknown to Mr. Nath, and contrary to her responsibilities, Defendant Idil Doguoglu-Posey did not list Mr. Nath as the owner and registrant of the domain name, but rather listed herself.

68.     During Defendants' employment with Mr. Nath, they gained access to Mr. Nath's personal information, including a copy of his driver's license and his social security number, in order to establish a PayPal account and complete other tasks on behalf of Elastic Wonder.

69.     In July of 2013, Defendants stopped working for Mr. Nath, and Mr. Nath has not conducted business with the Defendants since.

70.     Nonetheless, Defendants still control the domain name <www.elasticwonder.com> and the email addresses associated with the domain name.

71.     Furthermore, on July 23, 2013, Defendant Idil Doguoglu-Posey filed a federal trade mark application, claiming to be the owner of the mark ELASTIC WONDER NEW YORK.

72.     After locating Mr. Nath, Kickfurther identified and contacted Ms.  Thalhammer, the Chief Executive Officer and founder of Antidote Chocolate.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

73.     Ms. Thalhammer had no knowledge of any business dealings or communications with Kickfurther on behalf of Antidote Chocolate. Ms. Thalhammer had not authorized the Defendants to enter transactions with Kickfurther on behalf of Antidote Chocolate.

74.     Ms. Thalhammer communicated to Kickfurther that she was introduced to Defendant Idil Doguoglu-Posey thirteen years ago but had not had contact with any of the Defendants since then.

75.     Thereafter, Kickfurther was also able to confirm that the website <www.antidotechoc.com> provided to Kickfurther and its Supporters by the Defendants was an imitation of Antidote Chocolate's real website <www.antidotechoco.com>. Defendants have since removed the fraudulent website from the internet.

76.     Defendants were able to falsely represent to Kickfurther and its Supporters that they represented Mr. Nath, Antidote Chocolate, and Elastic Wonder through the use of Mr. Nath's fraudulently obtained personal information, Defendants' control of the domain names <www.elasticwonder.com> and <www.antidotechoc.com>, and Defendant Idil Doguoglu-Posey's misleading trademark application.

77.     Kickfurther's belief that Defendants represented Mr. Nath, Antidote Chocolate, and Elastic Wonder was material to Kickfurther's decision to enter into the Consignment Agreements and provide Defendants with funding.

78.     Upon learning that Defendants had surreptitiously obtained and used Mr. Nath's personal information and impersonated him in order to obtain money from Kickfurther, Kickfurther notified Defendants that it was terminating all dealings with them.

79.     Accordingly, on March 23, 2017, Kickfurther sent Defendants a letter demanding that Defendants send all inventory associated with the Consignment Agreements, or provide payment for the same, to Kickfurther within fifteen (15) days.

80.     To date, Kickfurther has not received the inventory or payment for any of the inventory associated with the Consignment Agreements from Defendants.

## COUNT I – THE CP CONSIGNMENT AGREEMENT

## BREACH OF CONTRACT

81.     Kickfurther restates the preceding allegations as if fully set forth herein.

82.     The CP Consignment Agreement is a valid and enforceable contract between Kickfurther and Defendants which is supported by sufficient consideration.

83.     Kickfurther has performed all of its obligations under the CP Consignment Agreement.

84.     Defendants have breached the CP Consignment Agreement by failing to return the inventory described in Exhibit A of the CP Consignment Agreement or provide payment of forty-eight thousand seven-hundred and eighty-seven dollars and fifty-six cents ($48, 787.56) for the inventory upon fifteen (15) business days' notice from Kickfurther.

85.     Defendants have further breached the CP Consignment Agreement, by knowingly making false statements and defrauding Kickfurther.  Accordingly, Defendants also owe Kickfurther liquidated damages in excess of two-hundred and fifty thousand dollars ($250,000).

86.     Kickfurther has been and continues to be damaged by Defendants' material breach of the CP Consignment Agreement.  Kickfurther respectfully requests this Court enter a judgment in its favor and against Defendants for actual damages in an amount to be proven at trial in excess of forty-eight thousand seven-hundred and eighty-seven dollars and fifty-six cents ($48, 787.56), for liquidated damages in excess of two-hundred and fifty thousand dollars ($250,000), for its costs to obtain relief in this action, including reasonable court costs and attorneys' fees, and for all interest to which it is legally entitled.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1
2
3

## COUNT II –THE AC CONSIGNMENT AGREEMENT

## BREACH OF CONTRACT

4
5
6

87.     Kickfurther restates the preceding allegations as if fully set forth herein.

7

88.     The AC Consignment Agreement is a valid and enforceable contract between Kickfurther and Defendants which is supported by sufficient consideration.

8
9

89.     Kickfurther has performed all of its obligations under the AC Consignment Agreement.

90.     Defendants have breached the AC Consignment Agreement by failing to return the inventory described in Exhibit A of the AC Consignment Agreement or provide payment of ninety-seven thousand nine hundred and forty-four dollars and sixty-four cents ($97,944.64) for the inventory upon fifteen (15) business days' notice from Kickfurther.

10
11
12
13
14

91.     Defendants have further breached the AC Consignment Agreement, by knowingly making false statements to Kickfurther and defrauding Kickfurther.  Accordingly, Defendants also owe Kickfurther liquidated damages in excess of two-hundred and fifty thousand dollars ($250,000).

15
16
17

92.     Kickfurther has been and continues to be damaged by Defendants' material breach of the AC Consignment Agreement.  Kickfurther respectfully requests this Court enter a judgment in its favor and against Defendants for actual damages in an amount to be proven at trial in excess of ninety-seven thousand nine hundred and forty-four dollars and sixty-four cents ($97,944.64), for liquidated damages in excess of two-hundred and fifty thousand dollars ($250,000), for its costs to obtain relief in this action, including reasonable court costs and attorneys' fees, and for all interest to which it is legally entitled.

18
19
20
21
22
23
24

## COUNT III –THE WC CONSIGNMENT AGREEMENT

## BREACH OF CONTRACT

25
26
27
28

93.     Kickfurther restates the preceding allegations as if fully set forth herein.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4847-5161-1211.1

94.     The WC Consignment Agreement is a valid and enforceable contract between Kickfurther and Defendants which is supported by sufficient consideration.

95.     Kickfurther has performed all of its obligations under the WC Consignment Agreement.

96.     Defendants have breached the WC Consignment Agreement by failing to return the inventory described in Exhibit A of the WC Consignment Agreement or provide payment of one hundred and eighty-six thousand eight hundred and ninety-two dollars and sixty cents ($186,892.60) for the inventory upon fifteen (15) business days' notice from Kickfurther.

97.     Defendants have further breached the WC Consignment Agreement, by knowingly making false statements and defrauding Kickfurther.  Accordingly, Defendants also owe Kickfurther liquidated damages in excess of two-hundred and fifty thousand dollars ($250,000).

98.     Kickfurther has been and continues to be damaged by Defendants' material breach of the WC Consignment Agreement.  Kickfurther respectfully requests this Court enter a judgment in its favor and against Defendants for actual damages in an amount to be proven at trial in excess of one hundred and eighty-six thousand eight hundred and ninety-two dollars and sixty cents ($186,892.60), for liquidated damages in excess of two-hundred and fifty thousand dollars ($250,000), for its costs to obtain relief in this action, including reasonable court costs and attorneys' fees, and for all interest to which it is legally entitled.

## COUNT IV – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

99.     Kickfurther restates the preceding allegations as if fully set forth herein.

100.     Each Consignment Agreement contains an  implied covenant of good faith and fair dealing, pursuant to which each contracting party agrees not to do anything to deprive the other party of the benefits of the Consignment Agreement.  The covenant of good faith and fair dealing also


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4847-5161-1211.1
16
COMPLAINT

imposes upon each party the duty to do everything that each Consignment Agreement presupposes that party will do to accomplish that Consignment Agreement's purpose.

101.    In undertaking the acts herein alleged, Defendants have deprived Kickfurther of the benefits of each Consignment Agreement.

102.    Kickfurther has performed its obligations under each Consignment Agreement.

103.    As a direct and proximate result of Defendants' breach of the covenant of good faith and fair dealing implied by law in each Consignment Agreement, Kickfurther has suffered and will continue to suffer actual damages in an amount to be proven at trial, plus interest thereon.

## COUNT V – UNJUST ENRICHMENT

104.    Kickfurther restates the preceding allegations as if fully set forth herein.

105.    Defendants, by the wrongful acts alleged herein, have been unjustly enriched by the receipt and acceptance of the money for the consignment inventory without providing any compensation or inventory to Kickfurther for the funds they received.  Defendants should be required to pay to Kickfurther for the amount of such unjust enrichment in an amount to be proven at trial, not less than three hundred and thirty-three thousand six hundred and twenty-four dollars and eighty cents ($333,624.80).

## COUNT VI – PROMISSORY ESTOPPEL

106.    Kickfurther restates the preceding allegations as if fully set forth herein.

107.    Defendants promised to accept possession of the consignment inventory on behalf of Kickfurther, sell the consignment inventory on behalf of Kickfurther, and pay Kickfurther the full consignment value of the inventory or return the consignment inventory to Kickfurther upon fifteen (15) business days' notice.

108.    Kickfurther relied on Defendants' promises and provided them with funding for the consignment inventory specified in the Consignment Agreements.

109.    Kickfurther's reliance on Defendants' promises was expected, reasonable, and foreseeable to Defendants.

110.    Defendants breached their promises to Kickfurther by not providing the full consignment value of the inventory or returning the consignment inventory to Kickfurther upon fifteen (15) business days' notice.

111.    As a direct and proximate result of Kickfurther's reliance on Defendants' promises, Kickfurther has suffered and will continue to suffer damages in an amount to be proven at trial, not less than three hundred and thirty-three thousand six hundred and twenty-four dollars and eighty cents ($333,624.80), plus interest thereon.

## COUNT VII – FRAUDULENT MISREPRESENTATION

112.    Kickfurther restates the preceding allegations as if fully set forth herein.

113.    Defendants intentionally misrepresented to Kickfurther that Defendant Carl Posey's business had plenty of assets, knowing that such misrepresentations were false at the time they were made.

114.    Defendants intentionally misrepresented to Kickfurther that they represented Mr. Nath, Antidote Chocolate, and Elastic Wonder, knowing that such misrepresentations were false at the time they were made.

115.    Defendants intentionally misrepresented to Kickfurther that they owned the U.S. trademark registration for the stylized logo of Elastic Wonder, knowing that such misrepresentations were false at the time they were made.


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

116.   Defendants intentionally misrepresented to Kickfurther that they were authorized to allow Kickfurther to obtain business and consumer credit reports and other due diligence information on behalf of Mr. Nath, knowing that such misrepresentations were false at the time they were made.

117.   Defendants intentionally misrepresented to Kickfurther that they were Mr. Nath through the use of false email addresses and telephone messages, knowing that such misrepresentations were false at the time they were made.

118.   Defendants intentionally misrepresented to Kickfurther that Mr. Nath executed a promissory note personally guaranteeing Kickfurther payment if Elastic Wonder defaulted on its obligations under the WC Consignment Agreement.

119.   Defendants made such misrepresentations with the intent that Kickfurther rely upon their misrepresentations in entering the Consignment Agreements and providing funding to Defendants.

120.   Defendants knew that Kickfurther was relying on their misrepresentations in determining whether to agree to purchase the consignment inventory and enter the Consignment Agreements.

121.   The misrepresentations were material to Kickfurther's decision to agree to buy the consignment inventory and to enter into the Consignment Agreements.

122.   At the time the misrepresentations were made, Kickfurther had a right to rely on Defendants' representations.

123.   At the time the misrepresentations were made, Kickfurther had no knowledge that the misrepresentations were false.

124.   Kickfurther reasonably relied upon the misrepresentations by agreeing to purchase the consignment inventory and by entering into the Consignment Agreements.  If Kickfurther had known



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

about Defendants' misrepresentations, it would not have agreed to purchase the consignment inventory or enter into the Consignment Agreements.

125.    As a result of Defendants' fraudulent misrepresentations, Kickfurther has been damaged.

126.    Defendants' above actions were preconceived, malicious, wanton and willful and warrant the imposition of punitive damages against Defendants.  Kickfurther respectfully requests this Court enter a judgment in its favor and against Defendants for actual damages in an amount to be proven at trial, together with punitive damages sufficient to punish Defendants and deter others from like conduct, for their costs to obtain relief in this action, including reasonable court costs and attorneys' fees, for all interest to which they are legally entitled, and for such other further relief as the Court deems proper under the circumstances.

**COUNT VIII – UNFAIR BUSINESS PRACTICES CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 et seq.**

127.    Kickfurther restates the preceding allegations as if fully set forth herein.

128.    By the conduct described above, Defendants have violated the provisions of the Labor Code as specified and have engaged in unlawful, deceptive, and unfair business practices prohibited by Business and Professions Code section 17200 et seq. directed at Kickfurther and its Supporters.

129.    The unlawful and unfair business practices complained of herein have occurred within the last four (4) years preceding the filing of this Complaint.

130.    Defendants generated income as a direct result of the above-mentioned unlawful and unfair business practices.  Kickfurther is therefore entitled to restitution of any and all monies withheld, acquired, and/or converted by Defendants by means of the unfair practices complained of herein.



**PRAYER FOR RELIEF**

Kickfurther respectfully requests the following relief:

        a.      Judgment in its favor and against Defendants on all claims;

        b.      Actual monetary damages in excess of three hundred and thirty-three thousand six hundred and twenty-four dollars and eighty cents ($333,624.80), in an amount to be determined according to proof at trial;

        c.      Liquidated damages in excess of seven hundred and fifty thousand dollars ($750,000);

        d.      Punitive damages sufficient to punish Defendants and deter others from like fraudulent misrepresentations;

        e.      Restitution of any and all monies withheld, acquired, and/or converted by Defendants by means of the unfair practices complained of by Kickfurther, in its claim for relief for Unfair Business Practices, pursuant to California Business and Professions Code §§ 17200 et seq;

        f.      Reasonable attorneys' fees and costs, pursuant to the Consignment Agreements and any other applicable law;

        g.      Pre-judgment and post-judgment interest on any award of damages to the fullest extent permitted by law; and

        h.      Any additional legal or equitable relief that the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## **JURY DEMAND**

2

Kickfurther demands a jury trial on all issues so triable.

3

4                          Respectfully Submitted,

5                    By: /s/ *Rene I. Gamboa*

6                        Rene I. Gamboa

7                        Jeffrey H. Kass, *pro hac vice application pending*
                         Robin E. Alexander, *pro hac vice application pending*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# EXHIBIT A

This sets forth an offer by Carl Posey Photography, Inc. ("Consignee" or "CP") to enter into a formal Consignment Agreement ("Agreement") with Ouiby Inc. d/b/a Kickfurther ("Consignor", Kickfurther, or "KF")(Both CP and KF, collectively, referred to herein as "Parties" and each, individually, a "Party"), as agent for and on behalf of "Backers" (as defined in Section 3 below). If accepted by Kickfurther, this offer becomes a binding Consignment Agreement subject to the terms and conditions contained herein.

Upon acceptance of this offer by Kickfurther, CP and KF will offer for sale, manage, and conduct the sale transactions for the products detailed in Exhibit A ("Consignment Inventory") on behalf of Kickfurther.

1. **Offer; Credit Check and Due Diligence. CP** authorizes Kickfurther to obtain business and consumer credit reports and other due diligence reports on CP and CP's principals prior to accepting this offer.

1.1 **Acceptance**.If accepted, Kickfurther will notify CP that it has accepted this offer ("Acceptance") within three (3) business days. Such acceptance may be made by posting CP's Co-Op to KF's platform. Once Kickfurther issues its Acceptance to CP, the Parties will have entered into a binding Consignment Agreement in consideration of and reliance upon the mutual covenants, agreements, and conditions hereinafter set forth.

1.2 **Rejection**. If Kickfurther takes no further action in response to this offer within three (3) business days, it shall be deemed rejected.

2. **Cost of Consignment Inventory.**Uponrequest by Kickfurther, CPshall, within three (3) business days, provide Kickfurther with any and all records, receipts, or accounts to verify the price CP will pay for the Consignment Inventory.

3. **Funding.**Following Kickfurther's Acceptance, CP authorizes Kickfurther to identify and work with individuals willing to purchase the Consignment Inventory (the "Buyers") between the date the offer is accepted and the Close Date set by CP herein or until such time as all Consignment Inventory has been purchased or returned.

4. **Products**. This Consignment Agreement shall cover the items and govern the sale, transfer, and payment of the inventory described herein at Exhibit A as may be amended from time to time and CP agrees to accept possession and be responsible for such goods and merchandise upon the terms and conditions as set forth herein. Any additions or amendments to Exhibit A shall be acknowledged by a written acceptance signed by the Parties. Any such consignment by KF to CP of Consignment Inventory shall be governed by the terms of this Agreement.

5. **Title to Products**. CP agrees to accept possession of Consignment Inventory from and/or on behalf of KF on a consignment basis, and to hold and care for the same as the property of KF. The Parties agree that the title to said Consignment Inventory, or its proceeds, shall always be the property of, and vested in, KF, but the title to said Consignment Inventory shall pass directly from KF to such person or persons to whom the same shall be sold in the manner and upon the terms herein contained so long as payment is received for the sale of such inventory, by KF, no more than thirty-five (35) days after such sale(s) occurred.

5.1 **UCC Financing Statement**. CP authorizes KF to file an UCC-1 Financing Statement with the appropriate Secretary of State or other authoritative body with respect to KF's interest in the Consignment Inventory provided. CP agrees to pay all filing costs related to this UCC-1 filing initially. Once CP has successfully completed its Co-Op and remitted payment in full to Kickfurther, Kickfurther shall reimburse CP for these filing costs. KF agrees to make the applicable filings to terminate such filing and any other related UCC filings once CP's contractual obligations are satisfied.

6. **Risk of Loss and Insurance**. CP shall be responsible to and shall reimburse KF, for all loss and expense, including but not limited to, reasonable attorneys fees and expenses, to KF resulting from damage to, destruction of, quality control, theft of or loss of Consignment Inventory (each a "**Loss**"), whether caused by CP or another (including without limitation, the manufacturer of such Consignment Inventory), and whether or not under CP's control, or from levy or attachment of any court process or lien thereon while in CP's possession. In the event of any Loss to any of the Consignment Inventory, this Agreement shall continue in full force and effect, without any modification or reduction of any obligation of CP. CP agrees to reasonably insure the Consignment Inventory, name KF as an additional insured and loss payee on such insurance policy, and shall include an endorsement to the effect that the insurer will provide KF with at least thirty (30) days prior written notice of any alteration or cancellation of such insurance, or in any change in KF's status as an additional insured and loss payee. Upon KF's request, CP shall deliver to KF satisfactory evidence of such insurance coverage.

7. **Right to Offer and Sell**.

**7.1 Right to Sell.** KF agrees to grant, and hereby grants, CP the right to offer for sale and manage and conduct the sale transactions for the Consignment Inventory on behalf of KF. CP hereby accepts such Consignment Inventory and agrees to use commercially reasonable efforts to identify purchasers for the Consignment Inventory, and assist [KF] in concluding the sale of, and managing and conducting the sales transactions for the Consignment Inventory, upon the terms and conditions set forth herein. CP also grants [KF] the right to offer for sale the Consignment Inventory on KF's own platform via the internet ("Kickfurther Store")(as further described at www.kickfurther.com, as that may be amended from time to time). KF shall provide CP with such relevant purchase information and CP shall be responsible for such delivery and shipment of the Consignment Inventory sold on the Kickfuther Store. CP also further agrees to be bound by such terms and conditions of KF's website with respect to the sale of the Consignment Inventory as set forth at www.kickfurther.com/terms (as that may be amended from time to time). CP hereby grants to KF a worldwide, non-exclusive, sub-licensable right and license, to indicate to the public that KF is an authorized distributor of the Consignment Inventory, to advertise the CP and Consignment Inventory, and to sell the Consignment Inventory. CP will pay KF the Revenue Share Price (defined below) plus an additional fee equal to ten percent (10%) of the sale price for each item of Consignment Inventory sold by KF or KF's users through online Kickfurther Stores.

7.2 **Payment for Items Sold in Kickfurther Stores.** KF will collect payments made through the Kickfurther Store or Kickfurther User Affiliate Stores. CP agrees to allow Kickfurther to retain the Revenue Share Price of each piece of Consignment Inventory sold through the Kickfurther Store until such time as the Consignment Inventory has been completely purchased. Kickfurther will place any funds from such purchases exceeding the Revenue Share Price of the sold Consignment Inventory into the CP's Kickfurther account and the CP has the choice of withdrawing such funds or utilizing these funds towards the payment of CP's Co-Op.

8. **Sale of Products**. CP shall use all commercially reasonable efforts to sell the Consignment Inventory and CP shall sell Consignment Inventory first, without regard to items already in CP's inventory. CP Agrees to sell such Consignment Inventory and CP agrees to pay KF the Revenue Share Price for each item of Consignment Inventory sold until KF has been paid the total consignment value of the inventory. For any preexisting inventory with the same SKU as the inventory provided under this Agreement, each item sold by CP will be deemed to be Consignment Inventory and not pre-existing inventory until the number of items sold by CP equals the Consignment Inventory provided under this Agreement.

9. **Payment Terms**.

9.1 **Payment Amount**s. The Option price and the Revenue Share price are set forth in the Exhibit .

9.2 **Payment Obligation**. CP shall pay Kickfurther the Revenue Share Price as set forth in Exhibit A for each piece of Consignment Inventory sold until KF has been paid the total consignment value of the inventory, subject to terms and conditions set forth below.

9.3 **Timing of Payments.**CP shall remit payment to KF for previously sold Consignment Inventory on the dates identified in Exhibit B and such monthly payments for sales Consignment Inventory shall continue until KF has been paid the total consignment value of the inventory.

9.4 **Lost/Destroyed, or Undelivered Items.**For each item of Consignment Inventory lost, destroyed, damaged, or otherwise not available for resale in new unused condition, CP shall remit to KF the Revenue Share Price simultaneously with the Monthly Report described in Section 9.5. KF shall not be responsible for any returned or defective Consignment Inventory and entitled to such payment regardless of such return or defect. CP shall be responsible for remitting the Option Price of any inventory included in Exhibit A, but not delivered to CP or KF due to factory delays, manufacturing problems, or any other reason should this Consignment Agreement be terminated pursuant to Section 12 or any of its subparts.

9.5 **Monthly Reports.**In additionto the payment obligations set forth herein, based on the schedule set forth in Exhibit B, CP shall, each month, deliver to KF a report (the "**Monthly Report**") of Consignment Inventory sold, lost, destroyed, or otherwise not available for resale in new and unused condition during the period beginning on the day after the last date covered by the immediately preceding Monthly Report until the date two days prior to the date of such Monthly Report, as well as the results of a physical inventory of the Consignment Inventory on the date that is two days prior to the date of such Monthly Report. CP shall make such a report, each month, until such time as KF has been paid the total consignment value of the inventory. Such Report may be made by inputting the applicable item information on a spreadsheet or other means made available by Kickfurther and further including any information required under this section. More frequent accountings will be made at KF's request. Amounts not paid when due shall bear interest at seven percent (7%) per annum.

9.6 **Failure to Provide Monthly Report**. If CP fails to deliver a monthly report based on the schedule set forth in Exhibit B or each month, until such time as KF has been paid the total consignment value of the inventory and, thereafter, fails to deliver a Monthly Report within five (5) days after KF's request for such report, CP agrees that all Consignment Inventory provided shall be deemed sold and payment for all Consignment Inventory provided shall become immediately due and payable to KF. CP further authorizes KF to execute a promissory note for this amount due as set forth in Section 9.7.

9.7. **Limited Power of Attorney Upon Failure to Provide Monthly Report**. CP agrees to grant KF a Limited Power of Attorney under this agreement to execute a Promissory Note on CP's behalf for the amount that CP owes for the Consignment Inventory as determined by KF under 9.6 and 12.3.1. CP agrees to execute the Limited Power of Attorney authorization attached hereto as Exhibit C and incorporated herein by this reference. CP agrees to allow KF to use such Limited Power Attorney to execute a Promissory Note in the form of the Note attached hereto as Exhibit D and incorporated herein by this reference on CP's behalf for the amount due, as determined solely by the KF, at the time the failure to provide the monthly report occurs.

10. **Right to Inspection**. Upon KF's request, CP shall deliver, within five (5) business days to KF true, correct, and complete copies of register tapes, sales slips, computer records, accounts, and any other records of CP related to this agreement. Further KF shall have the right to enter CP's premises, upon not less than 24 hours' advance notice, to take back Consignment Inventory and/or to determine the sales of Consignment Inventory. If KF discovers a discrepancy in the reporting of CP, CP agrees to pay all reasonable costs and expenses incurred by KF related to this provision including, but not limited to travel expenses and labor costs, if CP does not pay for any Consignment Inventory that is missing or otherwise not paid for within five (5) business days.

11. **Taxes, etc**. CP covenants and agrees: to pay all sales and excise taxes, federal and state withholding taxes, and all other taxes in connection with the sale of Consignment Inventory.

12. **Termination and Return of Consignment Inventory**.

12.1 **Termination Prior to Purchase of Consignment Inventory**. CP may terminate this Agreement by written notice at any time before Kickfurther has transferred funding to CP. CP shall pay Kickfurther a cancellation fee of five percent (5%) of the amount of CP's Co-Op if CP terminates this Agreement at such time.

12.2 **Termination After Purchase of Consignment Inventory.**

12.2.1 Termination by Kickfurther. This Agreement shall continue indefinitely until all consignment inventory is purchased, provided, however that this Agreement may be terminated by KF at any time and for any reason by giving written notice to CP, whereupon CP shall, within fifteen (15) business days thereafter return all Consignment Inventory to KF at a location designated solely by KF, and KF shall be responsible for paying any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory so long as shipment for the Consignment Inventory is arranged within this fifteen day period. CP shall acquire an estimate for any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory to KF and, upon KF's review of this estimate, KF will provide payment for this cost, if reasonable. The termination of this Agreement shall not affect the obligation of CP to pay all amounts that CP is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory.

12.2.2 Termination by Buyers. This Agreement may be terminated at the option of KF, acting as an agent for the Backers, if CP:

(i) pays 50% or less of its estimated payback for any designated Payout Date identified in Exhibit B, (ii) CP does not provide a payback update and/or a Monthly Report within one week of the expected date, or (iii) any Consignment Inventory remains unsold after the expected Final Payout Date identified in Exhibit B

Any such actions will lead to the Co-Op being placed into "Troubled" status and the Buyers having the option of terminating the agreement. If the agreement is terminated, KF shall send written notice to CP, whereupon CP shall, within fifteen (15) business days thereafter, return all Consignment Inventory to KF at a location designated solely by KF, and KF shall be responsible for paying any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory. CP shall acquire an estimate for any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory to KF and, upon KF's review of this estimate, KF will provide payment for this cost, if reasonable so long as shipment for the Consignment Inventory is arranged within this fifteen day period. The termination of this Agreement shall not affect the obligation of CP to pay all amounts that CP is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory.

12.2.3 Termination by CP. This Agreement shall continue indefinitely until all consignment inventory is purchased, provided, however, that this Agreement may be terminated by CP at any time and for any reason after the Purchase by giving written notice to KF, whereupon CP shall, within five (5) business days thereafter return all Consignment Inventory to KF at a location designated solely by KF, and CP shall be responsible for paying any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory. The termination of this Agreement shall not affect the obligation of CP to pay all amounts that CP is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory. Additionally, any cancellation initiated under Section 12.2.3 shall be subject to an Early Termination Fee equal to five percent (5%) of the cumulative Option Prices of any unsold or unpaid Consignment Inventory. This Early Termination Fee shall be due within thirty (30) days of Termination by CP.

## 12.3 **Effect of Termination**.

12.3.1 Duties Upon Termination. Upon termination of this Agreement, KF will provide CP with a final accounting of all sums owed by CP to KF and such sums shall be immediately due and payable fifteen (15) days after receipt of such accounting. In the event KF commences legal process against CP for recovery of Consignment Inventory, or in the event of conversion of Consignment Inventory, for damages sustained by KF, CP hereby waives the filing or posting of any and all bonds which may otherwise be required.

12.3.2 **Limited Power of Attorney Upon Termination**. CP agrees to grant KF a Limited Power of Attorney under this agreement to execute a Promissory Note on CP's behalf for a sum equal to the unpaid balance CP owes for Consignment Inventory for which payment has not been remitted to KF and which CP fails to deliver pursuant to the termination of CP's Co-Op or amount due under 12.2.3 during the time period set forth in Sections 12.2 and its subparts. CP agrees to execute the Limited Power of Attorney authorization attached hereto as Exhibit C and incorporated herein by this reference. CP agrees to allow KF to use such Limited Power Attorney to execute a Promissory Note in the form attached hereto as Exhibit D and incorporated herein by this reference on CP's behalf should CP fail to pay for or return all Consignment Inventory upon termination of CP's Co-Op.

13. <u>Insolvency of</u>CP. If CP becomes insolvent, or if a proceeding is brought by or against CP under the bankruptcy laws of the United States or any state of the United States, KF shall be entitled to immediately terminate this Agreement or cancel all orders of Consignment Inventory by CP then outstanding and shall receive reimbursement for the reasonable and proper cancellation charges accrued, together with all other amounts due to KF described herein, including, without limitation, the insurance, freight, shipping and handling charges and any restocking fees incurred by KF with respect to the Consignment Inventory being returned to or repossessed by KF. CP authorizes KF to enter CP's premises to remove all Consignment Inventory and to take any other actions and pursue any other remedies to which KF is entitled to under law or this Agreement.

14. <u>Miscellaneous.</u>

14.1 <u>Merger, Acquisition, Sale, or Change of Control of</u>CP's <u>Business.</u>CP agrees to inform KF of any bona fide offer made by CP to a third-party or from a third-party to CP to sell, buy, merge, dispose of, or otherwise substantially modify CP's business, control, or ownership within seventy-two (72) hours of such offer being made or received. CP further agrees to fully inform any such third-party about this Consignment Agreement, CP's offer, and CP's obligation related to this Agreement and the Offer. Upon the sale, merger, acquisition, or other transfer of control or ownership of CP's business, KF reserves the right to cancel this offer if a document acknowledging and assuming CP's obligations under this Consignment Agreement is not provided by the involved third-party, within fifteen days of any such sale, merger, acquisition, or other transfer of control or ownership of CP's business. CP agrees to grant Kickfurther power of attorney to complete and execute the attached promissory note for the full amount due at such time as a bona fide offer is made if a document

acknowledging and assuming CP's obligations under this Consignment Agreement is not provided by the involved third-party, within fifteen days of any such sale, merger, acquisition, or other transfer of control or ownership of CP's business

14.1 <u>Authorization and Release for Use of Co-Op Contents.</u>CP hereby authorizes and permits KF, and all KF's employees, contractors, and agents to use any and all text, images, photographs, or any other media or documents uploaded or otherwise entered into the Kickfurther platform for marketing, publicity, promotion, sales, or informational purposes without compensation. CP further authorizes that such materials may be reasonably edited or modified and waives any right to inspect or approve the finished product or material resulting from the use of such materials. CP acknowledges that KF will use good judgment and reasonableness when using or distributing such materials and agrees to release KF from all liability related to the use of such materials.

14.2 <u>Acknowledgement of Ownership.</u> CP hereby affirms that CP has ownership, licensing, or use rights to any and all media, documents, or text uploaded or added to CP's Co-Op by CP.

14.3 <u>Restriction on</u>CP <u>or Employees of</u>CP <u>Funding</u>CP's <u>Co-Op.</u>

CP's Business and Directors, Executives, Presidents, and Principals of CP's business, and such employees' immediate family members, shall not, cumulatively, provide more than ten percent (10%) of the total funding requested for CP's Co-Op. CP shall communicate this restriction to such employees. Kickfurther reserves the right to void any funding exceeding this amount and return the funds to their respective owner unless otherwise agreed, in writing, that such funding may exceed this ten percent (10%) amount.

14.4 **<u>Certain Liquidated Damages and Penalties</u>**. CP recognizes that a breach of Section 9, 10, or 12 or any subparts of these sections of this Consignment Agreement would cause KF irreparable injury and damage that cannot be reasonably or adequately compensated by damages in an action at law. Therefore, CP agrees that KF shall be entitled to injunctive and other equitable relief (without posting bond) to prevent and/or cure any such breach of threatened breach. CP also recognizes that proof of damages suffered by KF in the event of any such breach would be extremely costly, difficult, and inconvenient. Because of this CP agrees to the following:

14.4.1 In the event that CP breaches Section 9, 10, or 12 of this Consignment Agreement, CP agrees to pay Ouiby, Inc. the sum of Five Hundred Dollars ($500.00 USD) for each uncured breach, as a penalty. Kickfurther shall send notice of such breach or breaches to CP, in writing, by e-mail or certified mail and, if CP does not cure such breach or breaches by taking the appropriate action required under Sections 9, 10, or 12 within five (5) business days, Kickfurther shall provide CP with an invoice for the uncured breaches. Payment for such uncured breaches shall be immediately due and payable upon receipt of such an invoice and unpaid amounts shall bear interest at eight percent (8%) annually. CP agrees to allow KF to use the attached Limited Power Attorney to execute a Promissory Note in the form of the Note attached hereto on CP's behalf for the amount due pursuant to this paragraph if such breach is not cured within five (5) business days and payment for the breach is not received in ten (10) business days after KF sends notice to CP.

14.4.2 In the event that it is determined by a court of law or an arbitrator that CP made any knowingly false statements in the Co-Op text or to Kickfurther or Kickfurther employees, or made any knowingly false statements on the Kickfurther site or to Kickfurther users, or attempted to defraud Kickfurther or Kickfurther users, CP agrees to pay Ouiby, Inc. the sum of Two Hundred and Fifty Thousand U.S. Dollars ($250,000) for each breach, as liquidated damages in addition to being bound by any promissory note created as a function of this agreement. CP agrees that this amount is a reasonable estimate of the amount of damages Ouiby, Inc. are likely to suffer.

14.5 <u>Entire Agreement; Severability; Further Assurances</u>. This Agreement, including the Exhibits attached

hereto and referenced herein, constitute the entire agreement between the parties, and supersede all prior and contemporaneous agreements, understandings and negotiations, with respect to the subject matter hereof. In the event any provision of this Agreement is determined to be invalid or unenforceable, it is the desire and intention of the parties that such invalidity or unenforceability not invalidate or render unenforceable the remainder of the Agreement and that such provision be reformed and construed in such a manner that it will, to the maximum extent practicable, be deemed valid and enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly. Each party shall execute and deliver such further documents and take such further actions as may be required or reasonably requested by the other party to effectuate the purposes of this Agreement.

14.6 No Assignment; No Amendment; No Waiver. This Agreement (i) may not be assigned or transferred, in whole or in part, by operation of law or otherwise, by CP without the prior written consent of the KF, and (ii) may not be amended or modified, by course of conduct or otherwise, except in a writing duly executed by each of the Parties. Any waiver of any provision of this Agreement shall be in writing duly executed by the waiving Party. The failure or delay by either Party to seek redress for any breach or default under this Agreement, or to insist upon the strict performance of any provision of this Agreement, shall not constitute a waiver thereof or of any other provision of this Agreement, and such Party shall have all remedies provided herein and at law and in equity with respect to such act and any subsequent act constituting the same.

14.7 Governing Law; Jurisdiction and Venue; Attorneys' Fees. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado (without regard to the conflicts or choice of law principles thereof). The parties hereby agree and consent to the exclusive personal jurisdiction of the state and federal courts situated within the County of Boulder, State of Colorado for purposes of enforcing this Agreement, and waive any objection that they might have to personal jurisdiction or venue in those courts. In the event either party commences any proceeding against the other party with respect to this Agreement, the parties agree that the prevailing party (as determined by the authority before whom such proceeding is commenced) shall be entitled to recover reasonable attorneys' fees and costs as may be incurred in connection therewith in addition to any such other relief as may be granted.

14.8 WAIVER OF JURY TRIAL. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT EACH MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER PARTY ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED AND DELIVERED BY EITHER PARTY IN CONNECTION HEREWITH.

14.9 Construction of Agreement. The Parties acknowledge and agree that both Parties substantially participated in negotiating the provisions of this Agreement; and, therefore, the Parties agree that this Agreement shall not be construed more favorably toward one party than the other Party as a result of one Party primarily drafting the Agreement. This Section and other headings in this Agreement are for convenience of reference only and shall not affect, expressly or by implication, the meaning or interpretation of any of the provisions hereof.

14.10 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

14.11 Notices. Any notices (including requests, demands or other communication) to be sent by one Party to the other in connection with this Agreement shall be in writing and shall be delivered by reputable overnight courier, electronic mail, or by certified mail, return receipt requested and postage pre-paid.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**CONSIGNOR:**

**OUIBY INC. d/b/a Kickfurther**

By: *Sean De Clercq*

Name: Sean De Clercq

Title: Chief Executive Officer

Address: 1303 Alpine Ave. 24A

Boulder, Colorado 80304

Phone: (908) 405-6688

Email: sean@kickfurther.com

**CONSIGNEE:**

Carl Posey Photography, Inc.

Name: Carl Posey

Title: Owner          *Carl Posey*

Address: 341 Grove Street, 4th FL, Jersey City, NJ 07302

Phone: 9175832466

Email: idilvice@yahoo.com

Date: 2016-10-12

## EXHIBIT A

**CONSIGNMENT INVENTORY**

| SKU | KF Unit Cost | Revenue Share Price | Option Price | Lowest Selling Price | Quantity |
|---|---|---|---|---|---|
| IDILVICE Depeche Mode Skirt | 31.50 | 51.76 | 35.91 | 69.95 | 400 |
| Carl Posey x IDILVICE DMX T-Shirt | 60.50 | 102.12 | 68.96 | 138.00 | 200 |
| IDILVICE AC/DC T-Shirt Skirt | 31.50 | 51.76 | 35.91 | 69.95 | 400 |
| Carl Posey x IDILVICE Quest Love 2-sided T-Shirt | 27.50 | 44.36 | 31.35 | 59.95 | 200 |

## EXHIBIT B

**Project funded**
Oct 27, 2016

**Lead Time**
90 days

**Payment Time**
0 days

**First Payout**
Feb 25, 2017

**Second Payout**
Mar 25, 2017

**Third Payout**
Apr 25, 2017

**Fourth Payout**
May 25, 2017

**Final Payout**
Jun 25, 2017

Monthly Payouts are tied to sales and will likely be higher or lower than the estimate. These fluctuations in monthly payout do not impact your overall Costs.

## EXHIBIT C

### POWER OF ATTORNEY

KNOW BY ALL THESE PRESENTS, that the undersigned, **Carl Posey Photography, Inc.** (the "Company") hereby constitutes and appoints Ouiby, Inc. DBA Kickfurther signing singly, as the Company's true and lawful attorney-in-fact:

(1) to prepare, execute in the Company's name and, on the Company's behalf, the Promissory Note attached hereto as Exhibit D, and any and all other documents necessary or appropriate to effectuate, draft, and enforce such Promissory Note.

(2) to take any other action of any type whatsoever in connection with the foregoing Promissory Note which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of or legally required it being understood that the documents executed by such attorney-in-fact on behalf of the Company pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

The Company hereby grants to such attorney-in-fact full power and authority to do and perform any and every act and thing whatsoever requisite, necessary, or proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as the Company might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that such attorney-in-fact, or such attorney-in-fact's substitute or substitutes, shall lawfully do or cause to be done by virtue of this power of attorney and the rights and powers herein granted.

The Company acknowledges that the foregoing attorney-in-fact, in serving in such, is not assuming any of the Company's responsibilities to comply any rule or regulation.

This Power of Attorney is coupled with an interest and shall remain in full force and effect until such time as the attorney-in-fact provides written notice of termination to Company.

**IN WITNESS WHEREOF**, the undersigned has caused this Power of Attorney to be executed as of this **12** day of **October**, **2016**.

Date: ___10/12/2016___   Consignee: _Carl Posey_____

Name and Title: __photographer_____

_____

# EXHIBIT D

### PROMISSORY NOTE

$_____

Boulder, Colorado

_____ _____, 2016

**FOR VALUE RECEIVED**, the undersigned, _____, a _____ business, (referred to herein as the "Maker"), promises to pay Ouiby, Inc. a Delaware corporation (the "Payee"), at its principal place of business located at 1719 Alpine Avenue in Boulder, Colorado 80304, or at such other place as the holder or Payee hereof shall designate from time to time in writing, in lawful money of the United States of America, the principal sum of _____ ($_____).

1. **Terms of Payment.** The principal balance of this Promissory Note shall be due and payable immediately upon this Promissory Note's execution.

2. **Default.** If the payment or sum due from Maker to Payee is not paid within ten (10) calendar days of the date of execution, the amount thereof shall thereafter bear interest until paid at the rate of twelve percent (12%) per annum, compounded monthly (such rate being referred to as the "Default Rate"). Maker will pay to Payee upon demand any and all reasonable costs, expenses and fees, including without limitation reasonable attorneys' fees, incurred before or after suit is commenced in enforcing payment hereof, and such additional amounts shall be deemed to be additional amounts owed on this Note, payable with interest at the Default Rate, as provided herein, along with other amounts owed hereunder.

3. **Waiver.** Maker, each person or entity constituting Maker and all endorsers, sureties and guarantors, hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest in this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, unless expressly required elsewhere herein, and they agree that the liability of each of them shall be joint and several personal and unconditional, without regard to the liability of any other party, and shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, release, modification, surrender, exchange or substitution granted or consented to by Payee. Maker, each person or entity constituting Maker and all endorsers, sureties and guarantors consent to any and all extensions of time, renewals, waivers, releases or modifications that may be granted by Payee with respect to the payment or other provisions of this Note, and to the release, surrender or exchange of the collateral or any part thereof, with or without substitution, and agree that additional Makers, endorsers, guarantors or sureties may become parties hereto without notice to them and without affecting their liability hereunder. Any pledge, security interest or mortgage which secures the obligations evidenced hereby shall remain in full force and effect notwithstanding any such extension, renewal, waiver, release, modification, surrender, exchange or substitution. Payee shall not be bound to take any steps necessary to preserve any rights in any property held as security herefor against prior parties, which Maker hereby assumes to do, and these provisions shall apply and be controlling as to all property which may at any time be security for this Note.

4. **Choice of Laws; Venue and Miscellaneous.** This Note shall be construed in accordance with the laws of the State of Colorado. At Payee's election, the Federal and state courts located in Boulder County, Colorado exclusively shall have venue to render a judgment on claim(s) relating to this Note. Maker hereby submits to personal jurisdiction in the State of Colorado; waives any and all personal rights under the laws of any state or

country to object to jurisdiction within the State of Colorado for the purposes of litigation to enforce this Note or any other document related to security for this Note, if any. Nothing contained in this Note, however, shall prevent Lender from bringing any action or exercising any rights under this Note within any other state or country. Maker's initiating such proceeding or taking such action in any state or country shall in no event constitute a waiver of the agreement contained in this Note that the laws of the State of Colorado shall govern the rights and obligations of the Maker and Payee under this Note or a waiver of the submission made in this Note by the Maker to personal jurisdiction within Boulder County, Colorado. Maker agrees that service of process may be made, and personal jurisdiction over Maker obtained, by serving a copy of the Summons and Complaint upon Maker at its address set forth in this Note in accordance with the applicable laws of the State of Colorado. The proceeds represented by this Note have been used or will be used by maker for commercial and business purposes, and no part thereof has been or will be used for personal, family or household purposes.

In agreeing to the foregoing paragraph, the parties agree that resolution of disputes in the courts described herein is convenient for the purpose(s) of this Note. The parties further acknowledge that there are economic benefits to controlling the forum of any dispute and that those economic benefits are part of the consideration for this Note, that they have consulted an attorney or attorneys and fully understand that the parties may have other rights or defenses based on choice of law, venue selection, and/or personal jurisdiction, but the parties, nevertheless, voluntarily and knowingly elect to waive any and all such rights under, for and through this Note.

5. **Payee's Rights.** Payee shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Payee, and then only to the extent specifically set forth in the writing. A waiver as to one event shall not be construed as continuing or as a bar to or a waiver of any right or remedy as to a subsequent event. The remedies of Payee as provided in this Note and the warranties contained herein shall be cumulative and concurrent (and not exclusive), and may be pursued singly, successively or together at the sole discretion of Payee, and may be exercised as often as occasion therefore shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. Payee shall be entitled to recover all costs of collection and enforcement hereof after a default hereunder, including but not limited to, court costs and attorneys' fees, together with interest on any judgment obtained, at the Default Rate (or, if higher, at the rate provided for interest after judgment in the location where such judgment is obtained) until actual payment is made of the full amount due hereunder.

Maker agrees that, to the extent that Maker makes a payment or payments to Payee, which payment or payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to Maker or the estate, trustee, receiver thereof, or any other party, including without limitation any guarantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the obligations under this Note (or the parts thereof which have been paid, reduced or satisfied) shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred.

6. **Notice.** All notices or demands required or desired to be given under this Note shall be in writing and sent by either email or by registered or certified mail (postage prepaid, return receipt requested), or by overnight courier such as FedEx Express, addressed to Maker at the address set forth at the end of this Note or to Payee at the address set forth in the first paragraph hereof, or to such other address as any party may from time to time designate by written notice given to the other parties. Any notice given in accordance with the foregoing shall be deemed to have been given on the date upon which it is received after having been so transmitted. If transmitted by certified or registered mail, refusal thereof shall be deemed to be receipt.

7. **Gender, etc.** Whenever used, the singular number shall include the plural, the plural the singular, the use of any gender shall be applicable to all genders, and the words "Payee" and "Maker" shall be deemed to include the respective heirs, personal representatives, successors and assigns of Payee and Maker. In addition, if

"Maker" is comprised of more than one person or entity, then each agreement, covenant, representation, warranty, condition and provision shall apply to and be binding upon each constituent person or entity comprising Maker without regard to any liability, defenses, acts or omissions relating to any other person or entity comprising Maker, and each individual and entity comprising or constituting Maker shall be jointly and severally liable for all agreements, covenants, representations, warranties, condition and provisions hereof.

8. **Miscellaneous.** Time is strictly of the essence of the payment provisions and all other provisions of this Note. Payee may assign or otherwise negotiate this Note. The term "Payee" as used herein will mean any holder in due course. The captions of sections of this Note are for convenient reference only and will not affect the construction or interpretation of any of the terms and provisions set forth in this Note. This Note may not be amended, extended, renewed or modified, nor will any waiver of any provision hereof be effective except by an instrument in writing executed by an authorized officer of Payee. Any waiver or any provision hereof will be effective only in the specific instance and for the specific purpose for which given. In case one or more of the provisions herein contained shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Note shall be construed as if such invalid, illegal or unenforceable provisions had been modified and limited to the extent and only to the extent necessary to render the provision valid and enforceable. In no event shall any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law and if any such payment is paid by the Maker, then such excess sum shall be credited by the Payee as a payment of principal. No provision hereof shall effect or impair the absolute and unconditional obligation of the Maker to pay the principal hereof and interest hereon as herein provided without any abatement, diminution, postponement or deduction and without any reduction for counterclaim or setoff. In the event that at any time any payment received by Payee hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Maker and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

**IN WITNESS WHEREOF**, the Maker has caused this Note to be executed in its name at the place and on the date and year first above written.

**Consignee**: _____

By: Ouiby, Inc DBA Kickfurther, attorney-in-fact for Consignee

Signor: _____, its _____

Consignee's_Address:

_____

Consignee's Taxpayer ID No.: _____



# Audit Trail

Document ID: 130abfd3-3f4e-4f8a-8e46-1122668e791c

## Signer

Email: sales@kickfurther.com
IP Address: 97.118.117.138

Email: idilvice@yahoo.com
IP Address: 73.93.155.103

Email: idilvice@yahoo.com
IP Address: 73.93.155.103

## Signature

| Event | User | Time | IP Address |
|---|---|---|---|
| Upload document | sales@kickfurther.com | 10/12/16 12:15:54 PM EDT | 97.118.117.138 |
| Open document | sales@kickfurther.com | 10/12/16 12:16:01 PM EDT | 97.118.117.138 |
| Sign document | sales@kickfurther.com | 10/12/16 12:16:57 PM EDT | 97.118.117.138 |
| Close document | sales@kickfurther.com | 10/12/16 12:16:57 PM EDT | 97.118.117.138 |
| Invite signer | sales@kickfurther.com | 10/12/16 12:17:26 PM EDT | 97.118.117.138 |
| Open document | idilvice@yahoo.com | 10/12/16 12:49:43 PM EDT | 73.93.155.103 |
| Sign document | idilvice@yahoo.com | 10/12/16 12:53:57 PM EDT | 73.93.155.103 |

# EXHIBIT B

This sets forth an offer by Sabuh Nath ("Consignee" or "SA") to enter into a formal Consignment Agreement ("Agreement") with Ouiby Inc. d/b/a Kickfurther ("Consignor", Kickfurther, or "KF")(Both SA and KF, collectively, referred to herein as "Parties" and each, individually, a "Party"), as agent for and on behalf of "Buyers" (as defined in Section 3 below). If accepted by Kickfurther, this offer becomes a binding Consignment Agreement subject to the terms and conditions contained herein.

Upon acceptance of this offer by Kickfurther, SA and KF will offer for sale, manage, and conduct the sale transactions for the products detailed in Exhibit A ("Consignment Inventory") on behalf of Kickfurther.

1. **Offer; Credit Check and Due Diligence**. SA authorizes Kickfurther to obtain business and consumer credit reports and other due diligence reports on SA and SA's principals prior to accepting this offer.

1.1 **Acceptance**. If accepted, Kickfurther will notify SA that it has accepted this offer ("Acceptance") within three (3) business days. Such acceptance may be made by posting SA's Co-Op to KF's platform. Once Kickfurther issues its Acceptance to SA, the Parties will have entered into a binding Consignment Agreement in consideration of and reliance upon the mutual covenants, agreements, and conditions hereinafter set forth.

1.2 **Rejection**. If Kickfurther takes no further action in response to this offer within three (3) business days, it shall be deemed rejected.

1.3 **Total Raise Amount and Total Payment Amount**. SA agrees to use the services of KF to attempt raise a total of $87,450.00 to purchase the inventory set forth in Exhibit A. SA agrees and acknowledges the total payment obligation owed to Kickfurther for all of the inventory set forth in Exhibit A is $97,944.64, but that SA shall have the right to return such inventory, as provided by this Consignment Agreement, in lieu of such payment.

1.4 **Fees**. Kickfurther charges certain fees for each Consignment Agreement to offset payment processing costs, employee costs, overhead, and other cost. For this Co-Op, based on the estimated timeline set forth by SA as detailed in Exhibit B, SA agrees to pay Kickfurther a fee of $3,410.58 ("Kickfurther Fee").

1.4.1 **Month Definition for Fees**. In relation to section 1.4 and all subsections only, a month shall be deemed to mean the period beginning the day immediately after the 5th day of each month and commencing on the 5th day of the month immediately following that month.

1.4.2 **Refund of Certain Fees to SA**. If SA completes this Consignment Agreement one or more full months early KF agrees to refund 0.35% of the Total Raise Amount enumerated in Section 1.3 for each full month early SA completes the payment obligations set forth in this Consignment Agreement minus any applicable penalties or damages set forth in Section 14.4, and its subparts, of this Consignment Agreement.

1.4.3 **Additional Fees for Completing Later than Estimated**. If SA completes the payment obligations set forth in this Consignment Agreement later than the estimate Final Payout date set forth in Exhibit B, SA agrees to pay KF an amount equal to 0.35% of the Total Raise Amount for each month or partial month after the Final Payout date it takes SA to complete its payment obligation or return the Consignment Inventory to Kickfurther.

2. **Cost of Consignment Inventory.** Upon request by Kickfurther, SA shall, within three (3) business days, provide Kickfurther with any and all records, receipts, or accounts to verify the price SA will pay for the Consignment Inventory.

3. **Funding.** Following Kickfurther's Acceptance, SA authorizes Kickfurther to identify and work with individuals willing to purchase the Consignment Inventory (the "Buyers") between the date the offer is accepted

and the Close Date set by SA herein or until such time as all Consignment Inventory has been purchased or returned.

4. **Products**. This Consignment Agreement shall cover the items and govern the sale, transfer, and payment of the inventory described herein at Exhibit A as may be amended from time to time and SA agrees to accept possession and be responsible for such goods and merchandise upon the terms and conditions as set forth herein. Any additions or amendments to Exhibit A shall be acknowledged by a written acceptance signed by the Parties. Any such consignment by KF to SA of Consignment Inventory shall be governed by the terms of this Agreement.

5. **Title to Products**. SA agrees to accept possession of Consignment Inventory from and/or on behalf of KF on a consignment basis, and to hold and care for the same as the property of KF. The Parties agree that the title to said Consignment Inventory, or its proceeds, shall always be the property of, and vested in, KF, but the title to said Consignment Inventory shall pass directly from KF to such person or persons to whom the same shall be sold in the manner and upon the terms herein contained so long as payment is received for the sale of such inventory, by KF, no more than thirty-five (35) days after such sale(s) occurred.

5.1 <u>UCC Financing Statement</u>. SA authorizes KF to file an UCC-1 Financing Statement with the appropriate Secretary of State or other authoritative body with respect to KF's interest in the Consignment Inventory provided. SA agrees to pay all filing costs related to this UCC-1 filing initially. Once SA has successfully completed its Co-Op and remitted payment in full to Kickfurther, Kickfurther shall reimburse SA for these filing costs. KF agrees to make the applicable filings to terminate such filing and any other related UCC filings when SA's contractual obligations are satisfied.

6. **Risk of Loss and Insurance**. SA shall be responsible to and shall reimburse KF, for all loss and expense, including but not limited to, reasonable attorneys fees and expenses, to KF resulting from damage to, destruction of, quality control, theft of or loss of Consignment Inventory (each a "**Loss**"), whether caused by SA or another (including without limitation, the manufacturer of such Consignment Inventory), and whether or not under SA's control, or from levy or attachment of any court process or lien thereon while in SA's possession. In the event of any Loss to any of the Consignment Inventory, this Agreement shall continue in full force and effect, without any modification or reduction of any obligation of SA. SA agrees to reasonably insure the Consignment Inventory, name KF as an additional insured and loss payee on such insurance policy, and shall include an endorsement to the effect that the insurer will provide KF with at least thirty (30) days prior written notice of any alteration or cancellation of such insurance, or in any change in KF's status as an additional insured and loss payee. Upon KF's request, SA shall deliver to KF satisfactory evidence of such insurance coverage.

7. **Right to Offer and Sell**.

**7.1 Right to Sell.** KF agrees to grant, and hereby grants, SA the right to offer for sale and manage and conduct the sale transactions for the Consignment Inventory on behalf of KF. SA hereby accepts such Consignment Inventory and agrees to use commercially reasonable efforts to identify purchasers for the Consignment Inventory, and assist KF in marketing the sale of, and managing and conducting the sales transactions for the Consignment Inventory, upon the terms and conditions set forth herein. SA also grants KF the right to offer for sale the Consignment Inventory on KF's own platform via the internet ("Kickfurther Store")(as further described at www.kickfurther.com, as that may be amended from time to time). KF shall provide SA with such relevant purchase information and SA shall be responsible for such delivery and shipment of the Consignment Inventory sold on the Kickfurther Store. SA also further agrees to be bound by such terms and conditions of KF's website with respect to the sale of the Consignment Inventory as set forth at www.kickfurther.com/terms (as that may be amended from time to time). SA hereby grants to KF a worldwide, non-exclusive, sub-

licensable right and license, to indicate to the public that KF is an authorized distributor of the Consignment Inventory, to advertise the SA and Consignment Inventory, and to sell the Consignment Inventory. SA will pay KF the Revenue Share Price (defined below) plus an additional fee equal to ten percent (10%) of the sale price for each item of Consignment Inventory sold by KF or KF's users through online Kickfurther Stores.

7.2 **Payment for Items Sold in Kickfurther Stores.** KF will collect payments made through the Kickfurther Store or Kickfurther User Affiliate Stores. SA agrees to allow Kickfurther to retain the Revenue Share Price of each piece of Consignment Inventory sold through the Kickfurther Store until such time as the Consignment Inventory has been completely purchased. Kickfurther will place any funds from such purchases exceeding the Revenue Share Price of the sold Consignment Inventory into the SA's Kickfurther account and the SA has the choice of withdrawing such funds or utilizing these funds towards the payment of SA's Co-Op.

8. **Sale of Products**. SA shall use all commercially reasonable efforts to sell the Consignment Inventory and SA shall sell Consignment Inventory first, without regard to items already in SA's inventory. SA Agrees to sell such Consignment Inventory and SA agrees to pay KF the Revenue Share Price for each item of Consignment Inventory sold until KF has been paid the total consignment value of the inventory. For any preexisting inventory with the same SKU as the inventory provided under this Agreement, each item sold by SA will be deemed to be Consignment Inventory and not pre-existing inventory until the number of items sold by SA equals the Consignment Inventory provided under this Agreement.

9. **Payment Terms**.

9.1 **Payment Amounts**. The Option price and the Revenue Share price are set forth in the Exhibit .

9.2 **Payment Obligation**. SA shall pay Kickfurther the Revenue Share Price as set forth in Exhibit A for each piece of Consignment Inventory sold until KF has been paid the total consignment value of the inventory, subject to terms and conditions set forth below.

9.3 **Timing of Payments.** SA shall remit payment to KF for previously sold Consignment Inventory on the dates identified in Exhibit B and such payments for sales Consignment Inventory shall continue until KF has been paid the total consignment value of the inventory.

9.4 **Lost/Destroyed, or Undelivered Items.** For each item of Consignment Inventory lost, destroyed, damaged, or otherwise not available for resale in new unused condition, SA shall remit to KF the Revenue Share Price simultaneously with the Inventory Report described in Section 9.5. KF shall not be responsible for any returned or defective Consignment Inventory and shall be entitled to such payment regardless of such return or defect. SA shall be responsible for remitting the Option Price of any inventory included in Exhibit A, but not delivered to SA or KF due to factory delays, manufacturing problems, or any other reason should this Consignment Agreement be terminated pursuant to Section 12 or any of its subparts.

9.5 **Inventory Reports.** In addition to the payment obligations set forth herein, based on the schedule set forth in Exhibit B, SA shall, on or before each date contained therein, deliver to KF a report (the "**Inventory Report**") of Consignment Inventory sold, lost, destroyed, or otherwise not available for resale in new and unused condition during the period beginning on the day after the last date covered by the immediately preceding Inventory Report until the date two days prior to the date of such Inventory Report, as well as the results of a physical inventory of the Consignment Inventory on the date that is two days prior to the date of such Inventory Report. SA shall make such a report, twice monthly, until such time as KF has been paid the total consignment value of the inventory. Such Report may be made by inputting the applicable item information on a spreadsheet or other means made available by Kickfurther and further including any information required under this section. More frequent accountings will be made at KF's request. Amounts not paid when due shall bear interest at seven percent (7%) per annum.

9.6 **Failure to Provide Inventory Report**. If SA fails to deliver an Inventory Report based on the schedule set forth in Exhibit B or twice each month, until such time as KF has been paid the total consignment value of the inventory and, thereafter, fails to deliver an Inventory Report within five (5) days after KF's request for such report, SA agrees that all Consignment Inventory provided shall be deemed sold and payment for all Consignment Inventory provided shall become immediately due and payable to KF. SA further authorizes KF to execute a promissory note for this amount due as set forth in Section 9.7.

9.7. **Limited Power of Attorney Upon Failure to Provide Inventory Report**. SA agrees to grant KF a Limited Power of Attorney under this agreement to execute a Promissory Note on SA's behalf for the amount that SA owes for the Consignment Inventory as determined by KF under 9.6 and 12.3 and all subparts therein. SA agrees to execute the Limited Power of Attorney authorization attached hereto as Exhibit C and incorporated herein by this reference. SA agrees to allow KF to use such Limited Power Attorney to execute a Promissory Note in the form of the Note attached hereto as Exhibit D and incorporated herein by this reference on SA's behalf for the amount due, as determined solely by the KF, at the time the failure to provide the Inventory Report occurs.

## 10. Supplier Authorization; Right to Inspection

10.1 SA represents and warrants that it has provided KF with contact information for all suppliers, warehouses, and logistics providers that handle or at any time hereafter handles shipping, storage and/or fulfillment for the Consignment Inventory of this Agreement, if any (collectively, "Providers"). SA shall advise such Providers of this Agreement and the Kickfurther's rights pursuant to this Agreement, including the following:

10.1.1 KF shall have full access to any and all information available from any and all Providers regarding the Consignment Inventory.

10.1.2 KF shall have the right to request accountings from Providers of all Consignment Inventory held, sold, shipped, or otherwise disposed of by Providers and SA shall facilitate such requests for accountings and shall ensure that such accountings are, in fact, provided to KF within fifteen (15) days of each request.

10.1.3 SA authorizes KF, as its attorney in fact, to direct Providers to immediately discontinue shipping any Consignment Inventory and stop fulfilling orders for Consignment Inventory upon KF's determination, in its sole unrestricted discretion, that there may be a discrepancy in the amount paid to KF for the Consignment Inventory or if KF otherwise feels insecure about its rights under this Agreement or KF determines, in its sole, unrestricted discretion, that an event has occurred that may affect SI's business prospects or ability to pay for or return the Consignment Inventory. Such "stop order" shall continue until further written notice by KF to the Provider.

10.1.4 Upon termination of the Consignment Agreement for any reason, SA authorizes KF, as its attorney in fact, to direct Providers to send any and all Consignment Inventory, for which KF did not receive payment as required under the Consignment Agreement, to KF immediately.

10.1.5 SA shall, within 48 hours inform KF in writing of any changes in Providers for the Consignment Inventory.

10.1.6 If a Provider refuses to release requested information or Consignment Inventory to KF when requested by KF as provided herein, SA shall take any and all actions requested by KF or the Provider to rectify the situation so that such a refusal is cured by no later than fifteen (15) days after KF makes the original request.

10.1.7 Upon KF's request, SA shall deliver, within five (5) business days to KF true, correct, and complete copies of register tapes, sales slips, computer records, accounts, and any other records of SA related to this agreement.

10.1.8 Further KF shall have the right to enter SI's premises, upon not less than 24 hours' advance notice, to take back Consignment Inventory and/or to determine the sales of Consignment Inventory.

10.1.9 If KF discovers a discrepancy in the reporting of SA, SA agrees to pay all reasonable costs and expenses incurred by KF related to this provision including, but not limited to travel expenses and labor costs, if SA does not pay for any Consignment Inventory that is missing or otherwise not paid for within five (5) business days.

11. **Taxes, etc**. SA covenants and agrees: to pay all sales and excise taxes, federal and state withholding taxes, and all other taxes in connection with the sale of Consignment Inventory.

12. **Termination and Return of Consignment Inventory**.

12.1 **Termination Prior to Purchase of Consignment Inventory**. SA may terminate this Agreement by written notice at any time before KF has transferred funding to SA. SA shall pay KF a cancellation fee of five percent (5%) of the amount of SA's Co-Op if SA terminates this Agreement at such time.

12.2 **Termination After Purchase of Consignment Inventory.**

12.2.1 **Termination by Kickfurther.** This Agreement shall continue indefinitely until all consignment inventory is purchased, provided, however that this Agreement may be terminated by KF at any time and for any reason by giving written notice to SA, whereupon SA shall, within fifteen (15) business days thereafter return all Consignment Inventory to KF at a location designated solely by KF, and KF shall be responsible for paying any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory so long as shipment for the Consignment Inventory is arranged within this fifteen day period. SA shall acquire an estimate for any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory to KF and, upon KF's review of this estimate, KF will provide payment for this cost, if reasonable. The termination of this Agreement shall not affect the obligation of SA to pay all amounts that SA is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory.

12.2.2 **Termination by Buyers.** This Agreement may be terminated at the option of KF, acting as an agent for the Buyers, if SA:

(i) pays 50% or less of its estimated payback for any designated Payout Date identified in Exhibit B, (ii) SA does not provide a payback update and/or an Inventory Report within one week of the expected date, or (iii) any

Consignment Inventory remains unsold after the expected Final Payout Date identified in Exhibit B

Any such actions will lead to the Co-Op being placed into "Troubled" status and the Buyers having the option of terminating the agreement. If the agreement is terminated, KF shall send written notice to SA, whereupon SA shall, within fifteen (15) business days thereafter, return all Consignment Inventory to KF at a location designated solely by KF. SA shall acquire an estimate for any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory to KF and, upon KF's review of this estimate, KF will provide payment for this cost, if reasonable so long as shipment for the Consignment Inventory is arranged within this fifteen-day period. The termination of this Agreement shall not affect the obligation of SA to pay all amounts that SA is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory.

12.2.3 **Termination by SA.** This Agreement shall continue indefinitely until all consignment inventory is purchased, provided, however, that this Agreement may be terminated by SA at any time and for any reason after the Purchase by giving written notice to KF, whereupon SA shall, within five (5) business days thereafter return all Consignment Inventory to KF at a location designated solely by KF, and SA shall be responsible for paying any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory. The termination of this Agreement shall not affect the obligation of SA to pay all amounts that SA is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory. Additionally, any cancellation initiated under Section 12.2.3 shall be subject to an Early Termination Fee equal to five percent (5%) of the cumulative Option Prices of any unsold or unpaid Consignment Inventory. This Early Termination Fee shall be due within thirty (30) days of Termination by SA.

12.3 **Effect of Termination**.

12.3.1 **Duties Upon Termination.** Upon termination of this Agreement, KF will provide SA with a final accounting of all sums owed by SA to KF and such sums shall be immediately due and payable fifteen (15) days after receipt of such accounting. In the event KF commences legal process against SA for recovery of Consignment Inventory, or in the event of conversion of Consignment Inventory, for damages sustained by KF, SA hereby waives the filing or posting of any and all bonds which may otherwise be required.

12.3.2 **Limited Power of Attorney Upon Termination**. SA agrees to grant KF a Limited Power of Attorney under this agreement to execute a Promissory Note on SA's behalf for a sum equal to the unpaid balance SA owes for Consignment Inventory for which payment has not been remitted to KF and which SA fails to deliver pursuant to the termination of SA's Co-Op or amount due under 12.2.3 during the time period set forth in Sections 12.2 and its subparts. SA agrees to execute the Limited Power of Attorney authorization attached hereto as Exhibit C and incorporated herein by this reference. SA agrees to allow KF to use such Limited Power Attorney to execute a Promissory Note in the form attached hereto as Exhibit D and incorporated herein by this reference on SA's behalf should SA fail to pay for or return all Consignment Inventory upon termination of SA's Co-Op.

13. **Insolvency of SA.** If SA becomes insolvent, or if a proceeding is brought by or against SA under the bankruptcy laws of the United States or any state of the United States, KF shall be entitled to immediately terminate this Agreement or cancel all orders of Consignment Inventory by SA then outstanding and shall receive reimbursement for the reasonable and proper cancellation charges accrued, together with all other amounts due to KF described herein, including, without limitation, the insurance, freight, shipping and handling charges and any restocking fees incurred by KF with respect to the Consignment Inventory being returned to or repossessed by KF. SA authorizes KF to enter SA's premises to remove all Consignment Inventory and to take any other actions and pursue any other remedies to which KF is entitled to under law or this Agreement.

## 14. **Miscellaneous.**

14.1 **Merger, Acquisition, Sale, or Change of Control of SA's Business.** SA agrees to inform KF of any bona fide offer made by SA to a third-party or from a third-party to SA to sell, buy, merge, dispose of, or otherwise substantially modify SA's business, control, or ownership within seventy-two (72) hours of such offer being made or received. SA further agrees to fully inform any such third-party about this Consignment Agreement, SA's offer, and SA's obligation related to this Agreement and the Offer. Upon the sale, merger, acquisition, or other transfer of control or ownership of SA's business, KF reserves the right to cancel this offer if a document acknowledging and assuming SA's obligations under this Consignment Agreement is not provided by the involved third-party, within fifteen days of any such sale, merger, acquisition, or other transfer of control or ownership of SA's business. SA agrees to grant KF power of attorney to complete and execute the attached promissory note for the full amount due at such time as a bona fide offer is made if a document acknowledging and assuming SA's obligations under this Consignment Agreement is not provided by the involved third-party, within fifteen days of any such sale, merger, acquisition, or other transfer of control or ownership of SA's business

14.2 **Authorization and Release for Use of Co-Op Contents.** SA hereby authorizes and permits KF, and all KF's employees, contractors, and agents to use any and all text, images, photographs, or any other media or documents uploaded or otherwise entered into the Kickfurther platform for marketing, publicity, promotion, sales, or informational purposes without compensation. SA further authorizes that such materials may be reasonably edited or modified and waives any right to inspect or approve the finished product or material resulting from the use of such materials. SA acknowledges that KF will use good judgment and reasonableness when using or distributing such materials and agrees to release KF from all liability related to the use of such materials.

14.3 **Acknowledgement of Ownership.** SA hereby affirms that SA has ownership, licensing, or use rights to any and all media, documents, or text uploaded or added to SA's Co-Op by SA.

14.4 **Restriction on SA or Employees of SA Funding SA's Co-Op.** SA's Business and Directors, Executives, Presidents, and Principals of SA's business, and such employees' immediate family members, shall not, cumulatively, provide more than ten percent (10%) of the total funding requested for SA's Co-Op. SA shall communicate this restriction to such employees. KF reserves the right to void any funding exceeding this amount and return the funds to their respective owner unless otherwise agreed, in writing, that such funding may exceed this ten percent (10%) amount.

14.5 **Certain Liquidated Damages and Penalties.** SA recognizes that a breach of Section 9, 10, or 12 or any subparts of these sections of this Consignment Agreement would cause KF irreparable injury and damage that cannot be reasonably or adequately compensated by damages in an action at law. Therefore, SA agrees that KF shall be entitled to injunctive and other equitable relief (without posting bond) to prevent and/or cure any such breach of threatened breach. SA also recognizes that proof of damages suffered by KF in the event of any such breach would be extremely costly, difficult, and inconvenient. Because of this SA agrees to the following:

14.5.1 In the event that SA breaches Section 9, 10, or 12 of this Consignment Agreement, SA agrees to pay KF the sum of Five Hundred Dollars ($500.00 USD) for each uncured breach, as a penalty. KF shall send notice of such breach or breaches to SA, in writing, by e-mail or certified mail and, if SA does not cure such breach or breaches by taking the appropriate action required under Sections 9, 10, or 12 within five (5) business days, KF shall provide SA with an invoice for the uncured breaches. Payment for such uncured breaches shall be immediately due and payable upon receipt of such an invoice and unpaid amounts shall bear interest at eight percent (8%) annually. SA agrees to allow KF to use the attached Limited Power Attorney to execute a Promissory Note in the form of the Note attached hereto on SA's behalf for the amount due pursuant to this

paragraph if such breach is not cured within five (5) business days and payment for the breach is not received in ten (10) business days after KF sends notice to SA.

14.5.2 In the event that it is determined by a court of law or an arbitrator that SA made any knowingly false statements in the Co-Op text or to Kickfurther or Kickfurther employees, or made any knowingly false statements on the Kickfurther site or to Kickfurther users, or attempted to defraud Kickfurther or Kickfurther users, SA agrees to pay KF the sum of Two Hundred and Fifty Thousand U.S. Dollars ($250,000) for each breach, as liquidated damages in addition to being bound by any promissory note created as a function of this agreement. SA agrees that this amount is a reasonable estimate of the amount of damages KF. are likely to suffer.

14.6 **Entire Agreement; Severability; Further Assurances**. This Agreement, including the Exhibits attached hereto and referenced herein, constitute the entire agreement between the parties, and supersede all prior and contemporaneous agreements, understandings and negotiations, with respect to the subject matter hereof. In the event any provision of this Agreement is determined to be invalid or unenforceable, it is the desire and intention of the parties that such invalidity or unenforceability not invalidate or render unenforceable the remainder of the Agreement and that such provision be reformed and construed in such a manner that it will, to the maximum extent practicable, be deemed valid and enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly. Each party shall execute and deliver such further documents and take such further actions as may be required or reasonably requested by the other party to effectuate the purposes of this Agreement.

14.7 **No Assignment; No Amendment; No Waiver**. This Agreement (i) may not be assigned or transferred, in whole or in part, by operation of law or otherwise, by SA without the prior written consent of the KF, and (ii) may not be amended or modified, by course of conduct or otherwise, except in a writing duly executed by each of the Parties. Any waiver of any provision of this Agreement shall be in writing duly executed by the waiving Party. The failure or delay by either Party to seek redress for any breach or default under this Agreement, or to insist upon the strict performance of any provision of this Agreement, shall not constitute a waiver thereof or of any other provision of this Agreement, and such Party shall have all remedies provided herein and at law and in equity with respect to such act and any subsequent act constituting the same.

14.8 **Governing Law; Jurisdiction and Venue; Attorneys' Fees**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado (without regard to the conflicts or choice of law principles thereof). The parties hereby agree and consent to the exclusive personal jurisdiction of the state and federal courts situated within the County of Boulder, State of Colorado for purposes of enforcing this Agreement, and waive any objection that they might have to personal jurisdiction or venue in those courts. In the event either party commences any proceeding against the other party with respect to this Agreement, the parties agree that the prevailing party (as determined by the authority before whom such proceeding is commenced) shall be entitled to recover reasonable attorneys' fees and costs as may be incurred in connection therewith in addition to any such other relief as may be granted.

14.9 **WAIVER OF JURY TRIAL**. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT EACH MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER PARTY ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED AND DELIVERED BY EITHER PARTY IN CONNECTION HEREWITH.

14.10 **Construction of Agreement**. The Parties acknowledge and agree that both Parties substantially participated in negotiating the provisions of this Agreement; and, therefore, the Parties agree that this

Agreement shall not be construed more favorably toward one party than the other Party as a result of one Party primarily drafting the Agreement. This Section and other headings in this Agreement are for convenience of reference only and shall not affect, expressly or by implication, the meaning or interpretation of any of the provisions hereof.

14.11 **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

14.12 **Notices**. Any notices (including requests, demands or other communication) to be sent by one Party to the other in connection with this Agreement shall be in writing and shall be delivered by reputable overnight courier, electronic mail, or by certified mail, return receipt requested and postage pre-paid.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**CONSIGNOR:**

**OUIBY INC. d/b/a Kickfurther**

By:_____

Name: Sean De Clercq

Title: Chief Executive Officer

Address: 1719 Alpine Ave.

Boulder, Colorado 80304

Phone: (908) 405-6688

Email: sean@kickfurther.com

**CONSIGNEE:**

By:_____

Sabuh Nath

Name: Sabuh Nath

Address: 4410 Ketcham St, Elmhurst, NY 11373

Phone: 2122192848

Email: antidotechoco@yahoo.com

Date: 2016-12-08

# EXHIBIT A

**CONSIGNMENT INVENTORY**

| SKU | KF Unit Cost | Revenue Share Price | Option Price | Lowest Selling Price | Quantity |
|---|---|---|---|---|---|
| Favorites 6- Pack | 10.77 | 17.01 | 12.55 | 43.00 | 2000 |
| Raw 100% - 6Pack | 11.88 | 18.76 | 13.85 | 47.50 | 2000 |
| Complete Collection - 12Pack | 21.24 | 33.55 | 24.75 | 85.00 | 1000 |
| Explorer Case - 10 bars | 17.50 | 27.64 | 20.4 | 70.00 | 1000 |

**EXHIBIT B**

**Payment Schedule**

- Co-Op Expiration Date Dec 22, 2016
- Lead Time 3 months
- Total Payout $97,944.64
- Apr 5, 2017 *($16,324.10)* $81,620.54 remaining (est)
- Apr 19, 2017 *($16,324.10)* $65,296.44 remaining (est)
- May 6, 2017 *($16,324.10)* $48,972.34 remaining (est)
- May 20, 2017 *($16,324.10)* $32,648.24 remaining (est)
- Jun 5, 2017 *($16,324.10)* $16,324.14 remaining (est)
- Jun 19, 2017 *($16,324.14)* $0.00 remaining (est)

Payouts are tied to sales and will likely be higher or lower than the estimate. These fluctuations in payouts do not impact your overall Costs.

# EXHIBIT C

### POWER OF ATTORNEY

KNOW BY ALL THESE PRESENTS, that the undersigned, **Sabuh Nath** (the "Company") hereby constitutes and appoints Ouiby, Inc. DBA Kickfurther signing singly, as the Company's true and lawful attorney-in-fact:

(1) to prepare, execute in the Company's name and, on the Company's behalf, the Promissory Note attached hereto as Exhibit D, and any and all other documents necessary or appropriate to effectuate, draft, and enforce such Promissory Note.

(2) to take any other action of any type whatsoever in connection with the foregoing Promissory Note which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of or legally required it being understood that the documents executed by such attorney-in-fact on behalf of the Company pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

(3) To take any and all actions described in Section 10 and all of its Subparts of the Consignment Agreement to which this Power of Attorney is attached as an Exhibit.

The Company hereby grants to such attorney-in-fact full power and authority to do and perform any and every act and thing whatsoever requisite, necessary, or proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as the Company might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that such attorney-in-fact, or such attorney-in-fact's substitute or substitutes, shall lawfully do or cause to be done by virtue of this power of attorney and the rights and powers herein granted.

The Company acknowledges that the foregoing attorney-in-fact, in serving in such, is not assuming any of the Company's responsibilities to comply any rule or regulation.

This Power of Attorney is coupled with an interest and shall remain in full force and effect until such time as the attorney-in-fact provides written notice of termination to Company.

**IN WITNESS WHEREOF**, the undersigned has caused this Power of Attorney to be executed as of this **8** day of **December**, **2016**.

Date: _____ Consignee: _____
       December 8, 2016              Brand owner

Name and Title: _____

_____

# EXHIBIT D

### PROMISSORY NOTE

$_____

Boulder, Colorado

_____ _____, 2016

**FOR VALUE RECEIVED**, the undersigned, _____, a _____ business, (referred to herein as the "Maker"), promises to pay Ouiby, Inc. a Delaware corporation (the "Payee"), at its principal place of business located at 1719 Alpine Avenue in Boulder, Colorado 80304, or at such other place as the holder or Payee hereof shall designate from time to time in writing, in lawful money of the United States of America, the principal sum of _____ ($_____).

1. **Terms of Payment.** The principal balance of this Promissory Note shall be due and payable immediately upon this Promissory Note's execution.

2. **Default.** If the payment or sum due from Maker to Payee is not paid within ten (10) calendar days of the date of execution, the amount thereof shall thereafter bear interest until paid at the rate of twelve percent (12%) per annum, compounded monthly (such rate being referred to as the "Default Rate"). Maker will pay to Payee upon demand any and all reasonable costs, expenses and fees, including without limitation reasonable attorneys' fees, incurred before or after suit is commenced in enforcing payment hereof, and such additional amounts shall be deemed to be additional amounts owed on this Note, payable with interest at the Default Rate, as provided herein, along with other amounts owed hereunder.

3. **Waiver.** Maker, each person or entity constituting Maker and all endorsers, sureties and guarantors, hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest in this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, unless expressly required elsewhere herein, and they agree that the liability of each of them shall be joint and several personal and unconditional, without regard to the liability of any other party, and shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, release, modification, surrender, exchange or substitution granted or consented to by Payee. Maker, each person or entity constituting Maker and all endorsers, sureties and guarantors consent to any and all extensions of time, renewals, waivers, releases or modifications that may be granted by Payee with respect to the payment or other provisions of this Note, and to the release, surrender or exchange of the collateral or any part thereof, with or without substitution, and agree that additional Makers, endorsers, guarantors or sureties may become parties hereto without notice to them and without affecting their liability hereunder. Any pledge, security interest or mortgage which secures the obligations evidenced hereby shall remain in full force and effect notwithstanding any such extension, renewal, waiver, release, modification, surrender, exchange or substitution. Payee shall not be bound to take any steps necessary to preserve any rights in any property held as security herefor against prior parties, which Maker hereby assumes to do, and these provisions shall apply and be controlling as to all property which may at any time be security for this Note.

4. **Choice of Laws; Venue and Miscellaneous.** This Note shall be construed in accordance with the laws of the State of Colorado. At Payee's election, the Federal and state courts located in Boulder County, Colorado exclusively shall have venue to render a judgment on claim(s) relating to this Note. Maker hereby submits to personal jurisdiction in the State of Colorado; waives any and all personal rights under the laws of any state or

country to object to jurisdiction within the State of Colorado for the purposes of litigation to enforce this Note or any other document related to security for this Note, if any. Nothing contained in this Note, however, shall prevent Lender from bringing any action or exercising any rights under this Note within any other state or country. Maker's initiating such proceeding or taking such action in any state or country shall in no event constitute a waiver of the agreement contained in this Note that the laws of the State of Colorado shall govern the rights and obligations of the Maker and Payee under this Note or a waiver of the submission made in this Note by the Maker to personal jurisdiction within Boulder County, Colorado. Maker agrees that service of process may be made, and personal jurisdiction over Maker obtained, by serving a copy of the Summons and Complaint upon Maker at its address set forth in this Note in accordance with the applicable laws of the State of Colorado. The proceeds represented by this Note have been used or will be used by maker for commercial and business purposes, and no part thereof has been or will be used for personal, family or household purposes.

In agreeing to the foregoing paragraph, the parties agree that resolution of disputes in the courts described herein is convenient for the purpose(s) of this Note. The parties further acknowledge that there are economic benefits to controlling the forum of any dispute and that those economic benefits are part of the consideration for this Note, that they have consulted an attorney or attorneys and fully understand that the parties may have other rights or defenses based on choice of law, venue selection, and/or personal jurisdiction, but the parties, nevertheless, voluntarily and knowingly elect to waive any and all such rights under, for and through this Note.

5. **Payee's Rights.** Payee shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Payee, and then only to the extent specifically set forth in the writing. A waiver as to one event shall not be construed as continuing or as a bar to or a waiver of any right or remedy as to a subsequent event. The remedies of Payee as provided in this Note and the warranties contained herein shall be cumulative and concurrent (and not exclusive), and may be pursued singly, successively or together at the sole discretion of Payee, and may be exercised as often as occasion therefore shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. Payee shall be entitled to recover all costs of collection and enforcement hereof after a default hereunder, including but not limited to, court costs and attorneys' fees, together with interest on any judgment obtained, at the Default Rate (or, if higher, at the rate provided for interest after judgment in the location where such judgment is obtained) until actual payment is made of the full amount due hereunder.

Maker agrees that, to the extent that Maker makes a payment or payments to Payee, which payment or payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to Maker or the estate, trustee, receiver thereof, or any other party, including without limitation any guarantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the obligations under this Note (or the parts thereof which have been paid, reduced or satisfied) shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred.

6. **Notice.** All notices or demands required or desired to be given under this Note shall be in writing and sent by either email or by registered or certified mail (postage prepaid, return receipt requested), or by overnight courier such as FedEx Express, addressed to Maker at the address set forth at the end of this Note or to Payee at the address set forth in the first paragraph hereof, or to such other address as any party may from time to time designate by written notice given to the other parties. Any notice given in accordance with the foregoing shall be deemed to have been given on the date upon which it is received after having been so transmitted. If transmitted by certified or registered mail, refusal thereof shall be deemed to be receipt.

7. **Gender, etc.** Whenever used, the singular number shall include the plural, the plural the singular, the use of any gender shall be applicable to all genders, and the words "Payee" and "Maker" shall be deemed to include the respective heirs, personal representatives, successors and assigns of Payee and Maker. In addition, if

"Maker" is comprised of more than one person or entity, then each agreement, covenant, representation, warranty, condition and provision shall apply to and be binding upon each constituent person or entity comprising Maker without regard to any liability, defenses, acts or omissions relating to any other person or entity comprising Maker, and each individual and entity comprising or constituting Maker shall be jointly and severally liable for all agreements, covenants, representations, warranties, condition and provisions hereof.

8. **Miscellaneous.** Time is strictly of the essence of the payment provisions and all other provisions of this Note. Payee may assign or otherwise negotiate this Note. The term "Payee" as used herein will mean any holder in due course. The captions of sections of this Note are for convenient reference only and will not affect the construction or interpretation of any of the terms and provisions set forth in this Note. This Note may not be amended, extended, renewed or modified, nor will any waiver of any provision hereof be effective except by an instrument in writing executed by an authorized officer of Payee. Any waiver or any provision hereof will be effective only in the specific instance and for the specific purpose for which given. In case one or more of the provisions herein contained shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Note shall be construed as if such invalid, illegal or unenforceable provisions had been modified and limited to the extent and only to the extent necessary to render the provision valid and enforceable. In no event shall any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law and if any such payment is paid by the Maker, then such excess sum shall be credited by the Payee as a payment of principal. No provision hereof shall effect or impair the absolute and unconditional obligation of the Maker to pay the principal hereof and interest hereon as herein provided without any abatement, diminution, postponement or deduction and without any reduction for counterclaim or setoff. In the event that at any time any payment received by Payee hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Maker and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

**IN WITNESS WHEREOF**, the Maker has caused this Note to be executed in its name at the place and on the date and year first above written.

**Consignee**: _____

By: Ouiby, Inc DBA Kickfurther, attorney-in-fact for

Consignee Signor: _____, its _____

Consignee's Address:

_____

Consignee's Taxpayer ID No.: _____



# Audit Trail

Document ID: 62e2ced7-37c3-4119-a809-16be2b996db5

## Signer

Email: sales@kickfurther.com
IP Address: 71.218.1.151

## Signature

*Sean De Cleercq*

Email: antidotechoco@yahoo.com
IP Address: 70.197.9.84

*Sabudh Nath*

Email: antidotechoco@yahoo.com
IP Address: 70.197.9.84

*Sabudh Nath*

| Event | User | Time | IP Address |
|-------|------|------|-----------|
| Upload document | sales@kickfurther.com | 12/8/16 6:36:52 PM EST | 71.218.1.151 |
| Open document | sales@kickfurther.com | 12/8/16 6:37:28 PM EST | 71.218.1.151 |
| Sign document | sales@kickfurther.com | 12/8/16 6:38:51 PM EST | 71.218.1.151 |
| Close document | sales@kickfurther.com | 12/8/16 6:38:52 PM EST | 71.218.1.151 |
| Invite signer | sales@kickfurther.com | 12/8/16 6:39:15 PM EST | 71.218.1.151 |
| Open document | antidotechoco@yahoo.com | 12/8/16 6:44:33 PM EST | 73.231.138.176 |
| Open document | antidotechoco@yahoo.com | 12/8/16 7:24:49 PM EST | 73.231.138.176 |
| Open document | antidotechoco@yahoo.com | 12/8/16 9:47:52 PM EST | 70.197.9.84 |
| Sign document | antidotechoco@yahoo.com | 12/8/16 9:51:32 PM EST | 70.197.9.84 |

# EXHIBIT C

This sets forth an offer by Walking Candy Inc. ("Consignee" or "WA") to enter into a formal Consignment Agreement ("Agreement") with Ouiby Inc. d/b/a Kickfurther ("Consignor", Kickfurther, or "KF")(Both WA and KF, collectively, referred to herein as "Parties" and each, individually, a "Party"), as agent for and on behalf of "Buyers" (as defined in Section 3 below). If accepted by Kickfurther, this offer becomes a binding Consignment Agreement subject to the terms and conditions contained herein.

Upon acceptance of this offer by Kickfurther, WA and KF will offer for sale, manage, and conduct the sale transactions for the products detailed in Exhibit A ("Consignment Inventory") on behalf of Kickfurther.

1. **Offer; Credit Check and Due Diligence**. WA authorizes Kickfurther to obtain business and consumer credit reports and other due diligence reports on WA and WA's principals prior to accepting this offer.

1.1 **Acceptance**. If accepted, Kickfurther will notify WA that it has accepted this offer ("Acceptance") within three (3) business days. Such acceptance may be made by posting WA's Co-Op to KF's platform. Once Kickfurther issues its Acceptance to WA, the Parties will have entered into a binding Consignment Agreement in consideration of and reliance upon the mutual covenants, agreements, and conditions hereinafter set forth.

1.2 **Rejection**. If Kickfurther takes no further action in response to this offer within three (3) business days, it shall be deemed rejected.

1.3 **Total Raise Amount and Total Payment Amount**. WA agrees to use the services of KF to attempt raise a total of $175,925.00 to purchase the inventory set forth in Exhibit A. WA agrees and acknowledges the total payment obligation owed to Kickfurther for all of the inventory set forth in Exhibit A is $186,892.60, but that WA shall have the right to return such inventory, as provided by this Consignment Agreement, in lieu of such payment.

1.4 **Fees**. Kickfurther charges certain fees for each Consignment Agreement to offset payment processing costs, employee costs, overhead, and other cost. For this Co-Op, based on the estimated timeline set forth by WA as detailed in Exhibit B, WA agrees to pay Kickfurther a fee of $4,715.99 ("Kickfurther Fee").

1.4.1 **Month Definition for Fees**. In relation to section 1.4 and all subsections only, a month shall be deemed to mean the period beginning the day immediately after the 24th day of each month and commencing on the 24th day of the month immediately following that month.

1.4.2 **Refund of Certain Fees to WA**. If WA completes this Consignment Agreement one or more full months early KF agrees to refund 0.35% of the Total Raise Amount enumerated in Section 1.3 for each full month early WA completes the payment obligations set forth in this Consignment Agreement minus any applicable penalties or damages set forth in Section 14.4, and its subparts, of this Consignment Agreement.

1.4.3 **Additional Fees for Completing Later than Estimated**. If WA completes the payment obligations set forth in this Consignment Agreement later than the estimate Final Payout date set forth in Exhibit B, WA agrees to pay KF an amount equal to 0.35% of the Total Raise Amount for each month or partial month after the Final Payout date it takes WA to complete its payment obligation or return the Consignment Inventory to Kickfurther.

2. **Cost of Consignment Inventory.** Upon request by Kickfurther, WA shall, within three (3) business days, provide Kickfurther with any and all records, receipts, or accounts to verify the price WA will pay for the Consignment Inventory.

3. **Funding.** Following Kickfurther's Acceptance, WA authorizes Kickfurther to identify and work with individuals willing to purchase the Consignment Inventory (the "Buyers") between the date the offer is accepted and the Close Date set by WA herein or until such time as all Consignment Inventory has been purchased or returned.

3.1 **Transfer of Funds Raised Directly to Supplier(s)** If WA is ordering the Consignment Inventory directly from a supplier, WA agrees to provide KF with all information needed to effectuate the transfer of the funds raised to WA's supplier(s) for the inventory contained in Exhibit A. WA agrees to confirm the information provided, in writing, prior to KF sending funds to such supplier(s). WA further agrees to provide all necessary information regarding the form of such payments, the amounts of such payments, and any other information that may be required for KF to successfully transmit such payment(s). WA agrees to release KF from any and all liability resulting from the transfer, non-transfer, or attempted transfer of any funds by KF to any of WA's suppliers in consideration of KF allowing WA to use KF's platform.

4. **Products**. This Consignment Agreement shall cover the items and govern the sale, transfer, and payment of the inventory described herein at Exhibit A as may be amended from time to time and WA agrees to accept possession and be responsible for such goods and merchandise upon the terms and conditions as set forth herein. Any additions or amendments to Exhibit A shall be acknowledged by a written acceptance signed by the Parties. Any such consignment by KF to WA of Consignment Inventory shall be governed by the terms of this Agreement.

5. **Title to Products**. WA agrees to accept possession of Consignment Inventory from and/or on behalf of KF on a consignment basis, and to hold and care for the same as the property of KF. The Parties agree that the title to said Consignment Inventory, or its proceeds, shall always be the property of, and vested in, KF, but the title to said Consignment Inventory shall pass directly from KF to such person or persons to whom the same shall be sold in the manner and upon the terms herein contained so long as payment is received for the sale of such inventory, by KF, no more than thirty-five (35) days after such sale(s) occurred.

5.1 **UCC Financing Statement**. WA authorizes KF to file an UCC-1 Financing Statement with the appropriate Secretary of State or other authoritative body with respect to KF's interest in the Consignment Inventory provided. WA agrees to pay all filing costs related to this UCC-1 filing initially. Once WA has successfully completed its Co-Op and remitted payment in full to Kickfurther, Kickfurther shall reimburse WA for these filing costs. KF agrees to make the applicable filings to terminate such filing and any other related UCC filings when WA's contractual obligations are satisfied.

6. **Risk of Loss and Insurance**. WA shall be responsible to and shall reimburse KF, for all loss and expense, including but not limited to, reasonable attorneys fees and expenses, to KF resulting from damage to, destruction of, quality control, theft of or loss of Consignment Inventory (each a "**Loss**"), whether caused by WA or another (including without limitation, the manufacturer of such Consignment Inventory), and whether or not under WA's control, or from levy or attachment of any court process or lien thereon while in WA's possession. In the event of any Loss to any of the Consignment Inventory, this Agreement shall continue in full force and effect, without any modification or reduction of any obligation of WA. WA agrees to reasonably insure the

Consignment Inventory, name KF as an additional insured and loss payee on such insurance policy, and shall include an endorsement to the effect that the insurer will provide KF with at least thirty (30) days prior written notice of any alteration or cancellation of such insurance, or in any change in KF's status as an additional insured and loss payee. Upon KF's request, WA shall deliver to KF satisfactory evidence of such insurance coverage.

7. **Right to Offer and Sell**.

7.1 **Right to Sell.** KF agrees to grant, and hereby grants, WA the right to offer for sale and manage and conduct the sale transactions for the Consignment Inventory on behalf of KF. WA hereby accepts such Consignment Inventory and agrees to use commercially reasonable efforts to identify purchasers for the Consignment Inventory, and assist KF in marketing the sale of, and managing and conducting the sales transactions for the Consignment Inventory, upon the terms and conditions set forth herein. WA also grants KF the right to offer for sale the Consignment Inventory on KF's own platform via the internet ("Kickfurther Store")(as further described at www.kickfurther.com, as that may be amended from time to time). KF shall provide WA with such relevant purchase information and WA shall be responsible for such delivery and shipment of the Consignment Inventory sold on the Kickfurther Store. WA also further agrees to be bound by such terms and conditions of KF's website with respect to the sale of the Consignment Inventory as set forth at www.kickfurther.com/terms (as that may be amended from time to time). WA hereby grants to KF a worldwide, non-exclusive, sub-licensable right and license, to indicate to the public that KF is an authorized distributor of the Consignment Inventory, to advertise the WA and Consignment Inventory, and to sell the Consignment Inventory. WA will pay KF the Revenue Share Price (defined below) plus an additional fee equal to ten percent (10%) of the sale price for each item of Consignment Inventory sold by KF or KF's users through online Kickfurther Stores.

7.2 **Payment for Items Sold in Kickfurther Stores.** KF will collect payments made through the Kickfurther Store or Kickfurther User Affiliate Stores. WA agrees to allow Kickfurther to retain the Revenue Share Price of each piece of Consignment Inventory sold through the Kickfurther Store until such time as the Consignment Inventory has been completely purchased. Kickfurther will place any funds from such purchases exceeding the Revenue Share Price of the sold Consignment Inventory into the WA's Kickfurther account and the WA has the choice of withdrawing such funds or utilizing these funds towards the payment of WA's Co-Op.

8. **Sale of Products**. WA shall use all commercially reasonable efforts to sell the Consignment Inventory and WA shall sell Consignment Inventory first, without regard to items already in WA's inventory. WA Agrees to sell such Consignment Inventory and WA agrees to pay KF the Revenue Share Price for each item of Consignment Inventory sold until KF has been paid the total consignment value of the inventory. For any preexisting inventory with the same SKU as the inventory provided under this Agreement, each item sold by WA will be deemed to be Consignment Inventory and not pre-existing inventory until the number of items sold by WA equals the Consignment Inventory provided under this Agreement.

9. **Payment Terms**.

9.1 **Payment Amounts**. The Option price and the Revenue Share price are set forth in the Exhibit .

9.2 **Payment Obligation**. WA shall pay Kickfurther the Revenue Share Price as set forth in Exhibit A for each piece of Consignment Inventory sold until KF has been paid the total consignment value

of the inventory, subject to terms and conditions set forth below.

9.3 **Timing of Payments.** WA shall remit payment to KF for previously sold Consignment Inventory on the dates identified in Exhibit B and such payments for sales Consignment Inventory shall continue until KF has been paid the total consignment value of the inventory.

9.4 **Lost/Destroyed, or Undelivered Items.** For each item of Consignment Inventory lost, destroyed, damaged, or otherwise not available for resale in new unused condition, WA shall remit to KF the Revenue Share Price simultaneously with the Inventory Report described in Section 9.5. KF shall not be responsible for any returned or defective Consignment Inventory and shall be entitled to such payment regardless of such return or defect. WA shall be responsible for remitting the Option Price of any inventory included in Exhibit A, but not delivered to WA or KF due to factory delays, manufacturing problems, or any other reason should this Consignment Agreement be terminated pursuant to Section 12 or any of its subparts.

9.5 **Inventory Reports.** In addition to the payment obligations set forth herein, based on the schedule set forth in Exhibit B, WA shall, on or before each date contained therein, deliver to KF a report (the "**Inventory Report**") of Consignment Inventory sold, lost, destroyed, or otherwise not available for resale in new and unused condition during the period beginning on the day after the last date covered by the immediately preceding Inventory Report until the date two days prior to the date of such Inventory Report, as well as the results of a physical inventory of the Consignment Inventory on the date that is two days prior to the date of such Inventory Report. WA shall make such a report, twice monthly, until such time as KF has been paid the total consignment value of the inventory. Such Report may be made by inputting the applicable item information on a spreadsheet or other means made available by Kickfurther and further including any information required under this section. More frequent accountings will be made at KF's request. Amounts not paid when due shall bear interest at seven percent (7%) per annum.

9.6 **Failure to Provide Inventory Report**. If WA fails to deliver an Inventory Report based on the schedule set forth in Exhibit B or twice each month, until such time as KF has been paid the total consignment value of the inventory and, thereafter, fails to deliver an Inventory Report within five (5) days after KF's request for such report, WA agrees that all Consignment Inventory provided shall be deemed sold and payment for all Consignment Inventory provided shall become immediately due and payable to KF. WA further authorizes KF to execute a promissory note for this amount due as set forth in Section 9.7.

9.7. **Limited Power of Attorney Upon Failure to Provide Inventory Report**. WA agrees to grant KF a Limited Power of Attorney under this agreement to execute a Promissory Note on WA's behalf for the amount that WA owes for the Consignment Inventory as determined by KF under 9.6 and 12.3 and all subparts therein. WA agrees to execute the Limited Power of Attorney authorization attached hereto as Exhibit C and incorporated herein by this reference. WA agrees to allow KF to use such Limited Power Attorney to execute a Promissory Note in the form of the Note attached hereto as Exhibit D and incorporated herein by this reference on WA's behalf for the amount due, as determined solely by the KF, at the time the failure to provide the Inventory Report occurs.

## 10. **Supplier Authorization; Right to Inspection**

10.1 WA represents and warrants that it has provided KF with contact information for all suppliers, warehouses, and logistics providers that handle or at any time hereafter handles shipping, storage

and/or fulfillment for the Consignment Inventory of this Agreement, if any (collectively, "Providers"). WA shall advise such Providers of this Agreement and the Kickfurther's rights pursuant to this Agreement, including the following:

10.1.1 KF shall have full access to any and all information available from any and all Providers regarding the Consignment Inventory.

10.1.2 KF shall have the right to request accountings from Providers of all Consignment Inventory held, sold, shipped, or otherwise disposed of by Providers and WA shall facilitate such requests for accountings and shall ensure that such accountings are, in fact, provided to KF within fifteen (15) days of each request.

10.1.3 WA authorizes KF, as its attorney in fact, to direct Providers to immediately discontinue shipping any Consignment Inventory and stop fulfilling orders for Consignment Inventory upon KF's determination, in its sole unrestricted discretion, that there may be a discrepancy in the amount paid to KF for the Consignment Inventory or if KF otherwise feels insecure about its rights under this Agreement or KF determines, in its sole, unrestricted discretion, that an event has occurred that may affect WA's business prospects or ability to pay for or return the Consignment Inventory. Such "stop order" shall continue until further written notice by KF to the Provider.

10.1.4 Upon termination of the Consignment Agreement for any reason, WA authorizes KF, as its attorney in fact, to direct Providers to send any and all Consignment Inventory, for which KF did not receive payment as required under the Consignment Agreement, to KF immediately.

10.1.5 WA shall, within 48 hours inform KF in writing of any changes in Providers for the Consignment Inventory.

10.1.6 If a Provider refuses to release requested information or Consignment Inventory to KF when requested by KF as provided herein, WA shall take any and all actions requested by KF or the Provider to rectify the situation so that such a refusal is cured by no later than fifteen (15) days after KF makes the original request.

10.1.7 Upon KF's request, WA shall deliver, within five (5) business days to KF true, correct, and complete copies of register tapes, sales slips, computer records, accounts, and any other records of WA related to this agreement.

10.1.8 Further KF shall have the right to enter WA's premises, upon not less than 24 hours' advance notice, to take back Consignment Inventory and/or to determine the sales of Consignment Inventory.

10.1.9 If KF discovers a discrepancy in the reporting of WA, WA agrees to pay all reasonable costs and expenses incurred by KF related to this provision including, but not limited to travel expenses and labor costs, if WA does not pay for any Consignment Inventory that is missing or otherwise not paid for within five (5) business days.

11. **Taxes, etc**. WA covenants and agrees: to pay all sales and excise taxes, federal and state withholding taxes, and all other taxes in connection with the sale of Consignment Inventory.

12. **Termination and Return of Consignment Inventory**.

12.1 **Termination Prior to Purchase of Consignment Inventory**. WA may terminate this

Agreement by written notice at any time before KF has transferred funding to WA. WA shall pay KF a cancellation fee of five percent (5%) of the amount of WA's Co-Op if WA terminates this Agreement at such time.

## 12.2 **Termination After Purchase of Consignment Inventory.**

12.2.1 **Termination by Kickfurther.** This Agreement shall continue indefinitely until all consignment inventory is purchased, provided, however that this Agreement may be terminated by KF at any time and for any reason by giving written notice to WA, whereupon WA shall, within fifteen (15) business days thereafter return all Consignment Inventory to KF at a location designated solely by KF, and KF shall be responsible for paying any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory so long as shipment for the Consignment Inventory is arranged within this fifteen day period. WA shall acquire an estimate for any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory to KF and, upon KF's review of this estimate, KF will provide payment for this cost, if reasonable. The termination of this Agreement shall not affect the obligation of WA to pay all amounts that WA is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory.

12.2.2 **Termination by Buyers.** This Agreement may be terminated at the option of KF, acting as an agent for the Buyers, if WA:

(i) pays 50% or less of its estimated payback for any designated Payout Date identified in Exhibit B, (ii) WA does not provide a payback update and/or an Inventory Report within one week of the expected date, or (iii) any Consignment Inventory remains unsold after the expected Final Payout Date identified in Exhibit B

Any such actions will lead to the Co-Op being placed into "Troubled" status and the Buyers having the option of terminating the agreement. If the agreement is terminated, KF shall send written notice to WA, whereupon WA shall, within fifteen (15) business days thereafter, return all Consignment Inventory to KF at a location designated solely by KF. WA shall acquire an estimate for any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory to KF and, upon KF's review of this estimate, KF will provide payment for this cost, if reasonable so long as shipment for the Consignment Inventory is arranged within this fifteen-day period. The termination of this Agreement shall not affect the obligation of WA to pay all amounts that WA is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory.

12.2.3 **Termination by WA.** This Agreement shall continue indefinitely until all consignment inventory is purchased, provided, however, that this Agreement may be terminated by WA at any time and for any reason after the Purchase by giving written notice to KF, whereupon WA shall, within five (5) business days thereafter return all Consignment Inventory to KF at a location designated solely by KF, and WA shall be responsible for paying any shipping, handling, insurance and/or freight charges related to the return of such Consignment Inventory. The termination of this Agreement shall not affect the obligation of WA to pay all amounts that WA is required to pay to KF under this Agreement, including sums owed for unreturned Consignment Inventory. Additionally, any cancellation initiated under Section 12.2.3 shall be subject to an Early Termination Fee equal to five percent (5%) of the cumulative Option Prices of any unsold or unpaid Consignment Inventory. This Early Termination Fee shall be due within thirty (30) days of Termination by WA.

12.3 **Effect of Termination**.

12.3.1 **Duties Upon Termination.** Upon termination of this Agreement, KF will provide WA with a final accounting of all sums owed by WA to KF and such sums shall be immediately due and payable fifteen (15) days after receipt of such accounting. In the event KF commences legal process against WA for recovery of Consignment Inventory, or in the event of conversion of Consignment Inventory, for damages sustained by KF, WA hereby waives the filing or posting of any and all bonds which may otherwise be required.

12.3.2 **Limited Power of Attorney Upon Termination**. WA agrees to grant KF a Limited Power of Attorney under this agreement to execute a Promissory Note on WA's behalf for a sum equal to the unpaid balance WA owes for Consignment Inventory for which payment has not been remitted to KF and which WA fails to deliver pursuant to the termination of WA's Co-Op or amount due under 12.2.3 during the time period set forth in Sections 12.2 and its subparts. WA agrees to execute the Limited Power of Attorney authorization attached hereto as Exhibit C and incorporated herein by this reference. WA agrees to allow KF to use such Limited Power Attorney to execute a Promissory Note in the form attached hereto as Exhibit D and incorporated herein by this reference on WA's behalf should WA fail to pay for or return all Consignment Inventory upon termination of WA's Co-Op.

13. **Insolvency of WA or WA's Principals.** If WA becomes insolvent, or if a proceeding is brought by or against WA under the bankruptcy laws of the United States or any state of the United States, KF shall be entitled to immediately terminate this Agreement or cancel all orders of Consignment Inventory by WA then outstanding and shall receive reimbursement for the reasonable and proper cancellation charges accrued, together with all other amounts due to KF described herein, including, without limitation, the insurance, freight, shipping and handling charges and any restocking fees incurred by KF with respect to the Consignment Inventory being returned to or repossessed by KF. WA authorizes KF to enter WA's premises to remove all Consignment Inventory and to take any other actions and pursue any other remedies to which KF is entitled to under law or this Agreement. Additionally, WA agrees to alert KF if any Principal, defined any entity or individual owning at least 20% equity in WA, becomes insolvent, or if a proceeding is brought by such individuals or entities or against individuals or entities under the bankruptcy laws of the United States or any state of the United States.

14. **Miscellaneous.**

14.1 **Merger, Acquisition, Sale, or Change of Control of WA's Business.** WA agrees to inform KF of any bona fide offer made by WA to a third-party or from a third-party to WA to sell, buy, merge, dispose of, or otherwise substantially modify WA's business, control, or ownership within seventy-two (72) hours of such offer being made or received. WA further agrees to fully inform any such third-party about this Consignment Agreement, WA's offer, and WA's obligation related to this Agreement and the Offer. Upon the sale, merger, acquisition, or other transfer of control or ownership of WA's business, KF reserves the right to cancel this offer if a document acknowledging and assuming WA's obligations under this Consignment Agreement is not provided by the involved third-party, within fifteen days of any such sale, merger, acquisition, or other transfer of control or ownership of WA's business. WA agrees to grant KF power of attorney to complete and execute the attached promissory note for the full amount due at such time as a bona fide offer is made if a document acknowledging and assuming WA's obligations under this Consignment Agreement is not provided by the involved third-party, within fifteen days of any such sale, merger, acquisition, or other transfer of control or ownership of WA's business

**14.2 Authorization and Release for Use of Co-Op Contents.** WA hereby authorizes and permits KF, and all KF's employees, contractors, and agents to use any and all text, images, photographs, or any other media or documents uploaded or otherwise entered into the Kickfurther platform for marketing, publicity, promotion, sales, or informational purposes without compensation. WA further authorizes that such materials may be reasonably edited or modified and waives any right to inspect or approve the finished product or material resulting from the use of such materials. WA acknowledges that KF will use good judgment and reasonableness when using or distributing such materials and agrees to release KF from all liability related to the use of such materials.

**14.3 Acknowledgement of Ownership.** WA hereby affirms that WA has ownership, licensing, or use rights to any and all media, documents, or text uploaded or added to WA's Co-Op by WA.

**14.4 Restriction on WA or Employees of WA Funding WA's Co-Op.** WA's Business and Directors, Executives, Presidents, and Principals of WA's business, and such employees' immediate family members, shall not, cumulatively, provide more than ten percent (10%) of the total funding requested for WA's Co-Op. WA shall communicate this restriction to such employees. KF reserves the right to void any funding exceeding this amount and return the funds to their respective owner unless otherwise agreed, in writing, that such funding may exceed this ten percent (10%) amount. Kickfurther reserves the right to remove any and all voting rights resulting from contributions made by WA's Business and Directors, Executives, Presidents, and Principals of WA's business, and such employees' immediate family members.

**14.5 Certain Liquidated Damages and Penalties.** WA recognizes that a breach of Section 9, 10, or 12 or any subparts of these sections of this Consignment Agreement would cause KF irreparable injury and damage that cannot be reasonably or adequately compensated by damages in an action at law. Therefore, WA agrees that KF shall be entitled to injunctive and other equitable relief (without posting bond) to prevent and/or cure any such breach of threatened breach. WA also recognizes that proof of damages suffered by KF in the event of any such breach would be extremely costly, difficult, and inconvenient. Because of this WA agrees to the following:

14.5.1 In the event that WA breaches Section 9, 10, or 12 of this Consignment Agreement, WA agrees to pay KF the sum of Five Hundred Dollars ($500.00 USD) for each uncured breach, as a penalty. KF shall send notice of such breach or breaches to WA, in writing, by e-mail or certified mail and, if WA does not cure such breach or breaches by taking the appropriate action required under Sections 9, 10, or 12 within five (5) business days, KF shall provide WA with an invoice for the uncured breaches. Payment for such uncured breaches shall be immediately due and payable upon receipt of such an invoice and unpaid amounts shall bear interest at eight percent (8%) annually. WA agrees to allow KF to use the attached Limited Power Attorney to execute a Promissory Note in the form of the Note attached hereto on WA's behalf for the amount due pursuant to this paragraph if such breach is not cured within five (5) business days and payment for the breach is not received in ten (10) business days after KF sends notice to WA.

14.5.2 In the event that it is determined by a court of law or an arbitrator that WA made any knowingly false statements in the Co-Op text or to Kickfurther or Kickfurther employees, or made any knowingly false statements on the Kickfurther site or to Kickfurther users, or attempted to defraud Kickfurther or Kickfurther users, WA agrees to pay KF the sum of Two Hundred and Fifty Thousand U.S. Dollars ($250,000) for each breach, as liquidated damages in addition to being bound by any promissory note created as a function of this agreement. WA agrees that this amount is a reasonable estimate of the amount of damages KF. are likely to suffer.

14.6 **Entire Agreement; Severability; Further Assurances**. This Agreement, including the Exhibits attached hereto and referenced herein, constitute the entire agreement between the parties, and supersede all prior and contemporaneous agreements, understandings and negotiations, with respect to the subject matter hereof. In the event any provision of this Agreement is determined to be invalid or unenforceable, it is the desire and intention of the parties that such invalidity or unenforceability not invalidate or render unenforceable the remainder of the Agreement and that such provision be reformed and construed in such a manner that it will, to the maximum extent practicable, be deemed valid and enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly. Each party shall execute and deliver such further documents and take such further actions as may be required or reasonably requested by the other party to effectuate the purposes of this Agreement.

14.7 **No Assignment; No Amendment; No Waiver**. This Agreement (i) may not be assigned or transferred, in whole or in part, by operation of law or otherwise, by WA without the prior written consent of the KF, and (ii) may not be amended or modified, by course of conduct or otherwise, except in a writing duly executed by each of the Parties. Any waiver of any provision of this Agreement shall be in writing duly executed by the waiving Party. The failure or delay by either Party to seek redress for any breach or default under this Agreement, or to insist upon the strict performance of any provision of this Agreement, shall not constitute a waiver thereof or of any other provision of this Agreement, and such Party shall have all remedies provided herein and at law and in equity with respect to such act and any subsequent act constituting the same.

14.8 **Governing Law; Jurisdiction and Venue; Attorneys' Fees**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado (without regard to the conflicts or choice of law principles thereof). The parties hereby agree and consent to the exclusive personal jurisdiction of the state and federal courts situated within the County of Boulder, State of Colorado for purposes of enforcing this Agreement, and waive any objection that they might have to personal jurisdiction or venue in those courts. In the event either party commences any proceeding against the other party with respect to this Agreement, the parties agree that the prevailing party (as determined by the authority before whom such proceeding is commenced) shall be entitled to recover reasonable attorneys' fees and costs as may be incurred in connection therewith in addition to any such other relief as may be granted.

14.9 **<u>WAIVER OF JURY TRIAL</u>**. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT EACH MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER PARTY ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED AND DELIVERED BY EITHER PARTY IN CONNECTION HEREWITH.

14.10 **Construction of Agreement**. The Parties acknowledge and agree that both Parties substantially participated in negotiating the provisions of this Agreement; and, therefore, the Parties agree that this Agreement shall not be construed more favorably toward one party than the other Party as a result of one Party primarily drafting the Agreement. This Section and other headings in this Agreement are for convenience of reference only and shall not affect, expressly or by implication, the meaning or interpretation of any of the provisions hereof.

14.11 **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

14.12 **Notices**. Any notices (including requests, demands or other communication) to be sent by

one Party to the other in connection with this Agreement shall be in writing and shall be delivered by reputable overnight courier, electronic mail, or by certified mail, return receipt requested and postage pre-paid.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**CONSIGNOR:**

**OUIBY INC. d/b/a Kickfurther**

By:_____

Name: Sean De Clercq

Title: Chief Executive Officer

Address: 1719 Alpine Ave.

Boulder, Colorado 80304

Phone: (908) 405-6688

Email: sean@kickfurther.com

**CONSIGNEE:**

By:_____

Walking Candy Inc.

Name:**Sabudh Nath**

Address: 270 W 38th St Apt. 12-A New York, New York

Phone: 9175832466

Email: wearjazzmusic@yahoo.com

Date: 2017-01-31

**EXHIBIT A - Purchase Order**

To

| Walking Candy Inc.<br>270 W 38th St Apt. 12-A New York, New York<br>C/O Idil Doguoglu S. Chandra Nath | Customer: Kickfurther users |
| --- | --- |
| | Terms: COD |

For

| Ouiby, Inc. (dba Kickfurther)<br>1719 Alpine Ave<br>Boulder, CO 80304 | Ship Week Of: May 24, 2017 |
| --- | --- |

Walking Candy Inc. to hold inventory below for sale on behalf Ouiby, Inc.

## Please Ship the Following Items as Specified

| Item | Name | Quantity Ordered | KF Unit Cost | Revenue Share Price | Option Price | Lowest Selling Price | Total Amount |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 80 Shades Of Neutral Spandex Legg | 80 Shades Of Neutral Spandex Leggings Pack | 2500 | $67.98 | $240.00 | $74.76 | $240.00 | $186,900.00 |
| Total | | | | | | | $186,900.00 |

| Special Instructions:<br>Goods to be secured and/or produced and stored by Walking Candy Inc. for consignment sale.<br>Consignment terms governed by separate Consignment Agreement.<br>Goods to be provided to Ouiby, Inc. at its request. | Date: Jan 31, 2017 | Approval Signature by:<br>**Sabudh Nath**<br><br>Founder                *Sabudh Nath* |
| --- | --- | --- |
| | | Purchaser Signature:   *Sean De Clercq* |
| | | Name:<br>Sean De Clercq<br>CEO of Ouiby, Inc. |

**EXHIBIT B**

**Payment Schedule**

---

- Co-Op Expiration Date Feb 10, 2017
- Lead Time 3 months
- Total Payout $186,892.60
- May 24, 2017 *($93,446.30)* $93,446.30 remaining (est)
- Jun 7, 2017 *($93,446.30)* $0.00 remaining (est)

Payouts are tied to sales and will likely be higher or lower than the estimate. These fluctuations in payouts do not impact your overall Costs.

**EXHIBIT C**

## POWER OF ATTORNEY

KNOW BY ALL THESE PRESENTS, that the undersigned, **Walking Candy Inc.** (the "Company") hereby constitutes and appoints Ouiby, Inc. DBA Kickfurther signing singly, as the Company's true and lawful attorney-in-fact:

(1) to prepare, execute in the Company's name and, on the Company's behalf, the Promissory Note attached hereto as Exhibit D, and any and all other documents necessary or appropriate to effectuate, draft, and enforce such Promissory Note.

(2) to take any other action of any type whatsoever in connection with the foregoing Promissory Note which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of or legally required it being understood that the documents executed by such attorney-in-fact on behalf of the Company pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

(3) To take any and all actions described in Section 10 and all of its Subparts of the Consignment Agreement to which this Power of Attorney is attached as an Exhibit.

The Company hereby grants to such attorney-in-fact full power and authority to do and perform any and every act and thing whatsoever requisite, necessary, or proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as the Company might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that such attorney-in-fact, or such attorney-in-fact's substitute or substitutes, shall lawfully do or cause to be done by virtue of this power of attorney and the rights and powers herein granted.

The Company acknowledges that the foregoing attorney-in-fact, in serving in such, is not assuming any of the Company's responsibilities to comply any rule or regulation.

This Power of Attorney is coupled with an interest and shall remain in full force and effect until such time as the attorney-in-fact provides written notice of termination to Company.

**IN WITNESS WHEREOF**, the undersigned has caused this Power of Attorney to be executed as of this **31** day of **January**, **2017**.

Date: 01/31/2017_____   Consignee: *Sabudh Nath*_____

Name and Title: ___Sabudh Nath_____

  President
_____

**EXHIBIT D**

**PROMISSORY NOTE**

$_____

Boulder, Colorado

_____ _____, 2016

**FOR VALUE RECEIVED**, the undersigned, _____, a _____ business, (referred to herein as the "Maker"), promises to pay Ouiby, Inc. a Delaware corporation (the "Payee"), at its principal place of business located at 1719 Alpine Avenue in Boulder, Colorado 80304, or at such other place as the holder or Payee hereof shall designate from time to time in writing, in lawful money of the United States of America, the principal sum of _____ ($_____).

1. **Terms of Payment.** The principal balance of this Promissory Note shall be due and payable immediately upon this Promissory Note's execution.

2. **Default.** If the payment or sum due from Maker to Payee is not paid within ten (10) calendar days of the date of execution, the amount thereof shall thereafter bear interest until paid at the rate of twelve percent (12%) per annum, compounded monthly (such rate being referred to as the "Default Rate"). Maker will pay to Payee upon demand any and all reasonable costs, expenses and fees, including without limitation reasonable attorneys' fees, incurred before or after suit is commenced in enforcing payment hereof, and such additional amounts shall be deemed to be additional amounts owed on this Note, payable with interest at the Default Rate, as provided herein, along with other amounts owed hereunder.

3. **Waiver.** Maker, each person or entity constituting Maker and all endorsers, sureties and guarantors, hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest in this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, unless expressly required elsewhere herein, and they agree that the liability of each of them shall be joint and several personal and unconditional, without regard to the liability of any other party, and shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, release, modification, surrender, exchange or substitution granted or consented to by Payee. Maker, each person or entity constituting Maker and all endorsers, sureties and guarantors consent to any and all extensions of time, renewals, waivers, releases or modifications that may be granted by Payee with respect to the payment or other provisions of this Note, and to the release, surrender or exchange of the collateral or any part thereof, with or without substitution, and agree that additional Makers, endorsers, guarantors or sureties may become parties hereto without notice to them and without affecting their liability hereunder. Any pledge, security interest or mortgage which secures the obligations evidenced hereby shall remain in full force and effect notwithstanding any such extension, renewal, waiver, release, modification, surrender, exchange or substitution. Payee shall not be bound to take any steps necessary to preserve any rights in any property held as security herefor against prior parties, which Maker hereby assumes to do, and these provisions shall apply and be controlling as to all property which may at any time be security for this Note.

4. **Choice of Laws; Venue and Miscellaneous.** This Note shall be construed in accordance with

the laws of the State of Colorado. At Payee's election, the Federal and state courts located in Boulder County, Colorado exclusively shall have venue to render a judgment on claim(s) relating to this Note. Maker hereby submits to personal jurisdiction in the State of Colorado; waives any and all personal rights under the laws of any state or country to object to jurisdiction within the State of Colorado for the purposes of litigation to enforce this Note or any other document related to security for this Note, if any. Nothing contained in this Note, however, shall prevent Lender from bringing any action or exercising any rights under this Note within any other state or country. Maker's initiating such proceeding or taking such action in any state or country shall in no event constitute a waiver of the agreement contained in this Note that the laws of the State of Colorado shall govern the rights and obligations of the Maker and Payee under this Note or a waiver of the submission made in this Note by the Maker to personal jurisdiction within Boulder County, Colorado. Maker agrees that service of process may be made, and personal jurisdiction over Maker obtained, by serving a copy of the Summons and Complaint upon Maker at its address set forth in this Note in accordance with the applicable laws of the State of Colorado. The proceeds represented by this Note have been used or will be used by maker for commercial and business purposes, and no part thereof has been or will be used for personal, family or household purposes.

In agreeing to the foregoing paragraph, the parties agree that resolution of disputes in the courts described herein is convenient for the purpose(s) of this Note. The parties further acknowledge that there are economic benefits to controlling the forum of any dispute and that those economic benefits are part of the consideration for this Note, that they have consulted an attorney or attorneys and fully understand that the parties may have other rights or defenses based on choice of law, venue selection, and/or personal jurisdiction, but the parties, nevertheless, voluntarily and knowingly elect to waive any and all such rights under, for and through this Note.

5. **Payee's Rights.** Payee shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Payee, and then only to the extent specifically set forth in the writing. A waiver as to one event shall not be construed as continuing or as a bar to or a waiver of any right or remedy as to a subsequent event. The remedies of Payee as provided in this Note and the warranties contained herein shall be cumulative and concurrent (and not exclusive), and may be pursued singly, successively or together at the sole discretion of Payee, and may be exercised as often as occasion therefore shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. Payee shall be entitled to recover all costs of collection and enforcement hereof after a default hereunder, including but not limited to, court costs and attorneys' fees, together with interest on any judgment obtained, at the Default Rate (or, if higher, at the rate provided for interest after judgment in the location where such judgment is obtained) until actual payment is made of the full amount due hereunder.

Maker agrees that, to the extent that Maker makes a payment or payments to Payee, which payment or payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to Maker or the estate, trustee, receiver thereof, or any other party, including without limitation any guarantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the obligations under this Note (or the parts thereof which have been paid, reduced or satisfied) shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred.

6. **Notice.** All notices or demands required or desired to be given under this Note shall be in

writing and sent by either email or by registered or certified mail (postage prepaid, return receipt requested), or by overnight courier such as FedEx Express, addressed to Maker at the address set forth at the end of this Note or to Payee at the address set forth in the first paragraph hereof, or to such other address as any party may from time to time designate by written notice given to the other parties. Any notice given in accordance with the foregoing shall be deemed to have been given on the date upon which it is received after having been so transmitted. If transmitted by certified or registered mail, refusal thereof shall be deemed to be receipt.

7. **Gender, etc.** Whenever used, the singular number shall include the plural, the plural the singular, the use of any gender shall be applicable to all genders, and the words "Payee" and "Maker" shall be deemed to include the respective heirs, personal representatives, successors and assigns of Payee and Maker. In addition, if "Maker" is comprised of more than one person or entity, then each agreement, covenant, representation, warranty, condition and provision shall apply to and be binding upon each constituent person or entity comprising Maker without regard to any liability, defenses, acts or omissions relating to any other person or entity comprising Maker, and each individual and entity comprising or constituting Maker shall be jointly and severally liable for all agreements, covenants, representations, warranties, condition and provisions hereof.

8. **Miscellaneous.** Time is strictly of the essence of the payment provisions and all other provisions of this Note. Payee may assign or otherwise negotiate this Note. The term "Payee" as used herein will mean any holder in due course. The captions of sections of this Note are for convenient reference only and will not affect the construction or interpretation of any of the terms and provisions set forth in this Note. This Note may not be amended, extended, renewed or modified, nor will any waiver of any provision hereof be effective except by an instrument in writing executed by an authorized officer of Payee. Any waiver or any provision hereof will be effective only in the specific instance and for the specific purpose for which given. In case one or more of the provisions herein contained shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Note shall be construed as if such invalid, illegal or unenforceable provisions had been modified and limited to the extent and only to the extent necessary to render the provision valid and enforceable. In no event shall any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law and if any such payment is paid by the Maker, then such excess sum shall be credited by the Payee as a payment of principal. No provision hereof shall effect or impair the absolute and unconditional obligation of the Maker to pay the principal hereof and interest hereon as herein provided without any abatement, diminution, postponement or deduction and without any reduction for counterclaim or setoff. In the event that at any time any payment received by Payee hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Maker and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

**IN WITNESS WHEREOF**, the Maker has caused this Note to be executed in its name at the place and on the date and year first above written.

**Consignee**: _____

By: Ouiby, Inc DBA Kickfurther, attorney-in-fact for

Consignee Signor: _____, its _____

Consignee's Address:

_____

Consignee's Taxpayer ID No.: _____



# Audit Trail

Document ID: 7b5804d2-9f62-4102-bae1-45e8a4da2d24

| Signer | Signature |
| --- | --- |
| Email: sales@kickfurther.com<br>IP Address: 97.118.100.29 | *Sean De Clercq* |
| Email: sales@kickfurther.com<br>IP Address: 97.118.100.29 | *Sean De Clercq* |
| Email: wearjazzmusic@yahoo.com<br>IP Address: 73.231.138.176 | *Sabudh Nath* |
| Email: wearjazzmusic@yahoo.com<br>IP Address: 73.231.138.176 | *Sabudh Nath* |
| Email: wearjazzmusic@yahoo.com<br>IP Address: 73.231.138.176 | *Sabudh Nath* |

| Event | User | Time | IP Address |
| --- | --- | --- | --- |
| Upload document | sales@kickfurther.com | 1/31/17 6:48:03 PM EST | 97.118.100.29 |
| Open document | sales@kickfurther.com | 1/31/17 6:48:06 PM EST | 97.118.100.29 |
| Sign document | sales@kickfurther.com | 1/31/17 6:49:33 PM EST | 97.118.100.29 |
| Close document | sales@kickfurther.com | 1/31/17 6:49:33 PM EST | 97.118.100.29 |
| Invite signer | sales@kickfurther.com | 1/31/17 6:49:58 PM EST | 97.118.100.29 |
| Open document | wearjazzmusic@yahoo.com | 1/31/17 8:00:57 PM EST | 73.231.138.176 |
| Sign document | wearjazzmusic@yahoo.com | 1/31/17 8:09:01 PM EST | 73.231.138.176 |
| Close document | wearjazzmusic@yahoo.com | 1/31/17 8:09:03 PM EST | 73.231.138.176 |
| Download document | sales@kickfurther.com | 1/31/17 10:31:10 PM EST | 50.170.170.131 |

# EXHIBIT D

**Exhibit D**

**PROMISSORY NOTE**

$186,892.60
Boulder, Colorado

1/31/2017

In Boulder, Colorado on the above date, for value received, the undersigned, Walking Candy Inc., a business located at 270 W 38th St Apt 12-A New York, New York and Sabudh Nath, an individual residing at 8675 PALO ALTO ST JAMAICA, NY 11423-1203 Walking Candy Inc. and Sabudh Nath each individually a "Maker" and both, collectively, as "Makers") both jointly and severally promise to pay Ouiby, Inc. a Delaware corporation (the "Payee"), at its principal place of business located in Boulder, Colorado 80304, or at such other place as the holder or Payee hereof shall designate from time to time in writing, in lawful money of the United States of America, the principal sum of $186,892.60

1.    **Terms of Payment.**  The principal balance of this Promissory Note shall be payable as follows, without interest (except as provided below upon a default or upon the occurrence of certain other events):

Payment towards the principal sum of this note shall be made pursuant to the terms set forth in the Consignment Agreement entered into by and between Ouiby, Inc. and Walking Candy Inc., which is attached hereto and incorporated herein by this reference. However, should the Consignment Agreement by and between Ouiby, Inc. and Walking Candy Inc. be terminated by Ouiby, Inc., payment of this note shall become due and payment, in full, shall be made by Makers by no later than fifteen (15) days after Ouiby, Inc. sending Makers such notice of termination of the Consignment Agreement.

2.    **Prepayment.**  Makers may, at any time and from time to time, prepay all or part of the outstanding principal amount due hereunder without penalty or premium. Such payments shall be required for sales of Consignment Inventory as set forth in the Consignment Agreement. All such prepayments shall be accompanied by the payment of accrued interest to the date of payment on the amount prepaid.

3.    **Acceleration and Default.**   If any payment or sum due from Makers to Payee pursuant to the Consignment Agreement is not paid within fifteen (15) calendar days of the date due, the amount thereof shall thereafter bear interest until paid at the rate of twelve percent (12%) per annum, compounded monthly (such rate being referred to as the "Default Rate"), it being understood that such Default Rate being in addition to the late charge provided herein.  It is further understood, however, that without limiting the absolute and unconditional right of the Payee to demand payment of this Note at any time, the entire balance of this Note shall become immediately due and payable without presentment, notice, demand or protest upon the happening of any of the following events of default: (A) the Makers or any guarantor of this Note

(i) shall admit in writing its inability to pay its debts as such debts become due; or (ii) shall make an assignment for the benefit of creditors or petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets; or (iii) shall commence any proceeding under any bankruptcy, reorganization, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; or (iv) shall have had any such petition or application filed or any such proceeding shall have been commenced against it in which an adjudication or appointment is made or order for relief is entered, or which petition, application or proceeding remains undismissed for a period of thirty (30) days or more; or (v) shall be the subject of any proceeding under which all or substantially all of its assets may be subject to seizure, forfeiture or divestiture, which proceeding remains undismissed for a period of thirty (30) days or more; or (vi) by any act or omission shall indicate its consent to, approval of or acquiescence in any such petition, application or proceeding or order for relief or the appointment of a custodian, receiver or trustee for all or any substantial part of its property; or (vii) shall suffer any such custodianship, receivership or trusteeship to continue undischarged for a period of thirty (30) days or more; or (B) any guarantor of this Note shall die.   The foregoing shall not be construed to affect the "demand" nature of this Note and, notwithstanding the absence of the foregoing listed events, Payee shall retain the right to demand payment hereunder.

In the event that any payment required under this Note shall become overdue for a period in excess of fifteen (15) days, a "late charge" of five percent (5%) of the amount so overdue may be charged by the Payee for each month, or portion thereof, that such amount remains unpaid as liquidated damages for losses due to accounting and other expenses incident to handling such delinquent payment(s).   The foregoing late charge (i) shall be applicable without regard to notice of nonpayment, (ii) shall not be deemed to excuse any default, and (iii) shall not preclude any other remedy hereunder, including, without limitation, Payee's right to charge the Default Rate, all remedies hereunder being cumulative.

Makers will pay to Payee upon demand any and all reasonable costs, expenses and fees, including without limitation reasonable attorneys' fees, incurred before or after suit is commenced in enforcing payment hereof, and such additional amounts shall be deemed to be additional amounts owed on this Note, payable with interest at the Default Rate and with the stated late charge, as provided herein, along with other amounts owed hereunder.

4.     **Waiver.**  Makers, each person or entity constituting a Maker and all endorsers, sureties and guarantors, hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest in this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, unless expressly required elsewhere herein, and they agree that the liability of each of them shall be joint and several personal and unconditional, without regard to the liability of any other party, and shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, release, modification, surrender, exchange or substitution granted or consented to by Payee.  Makers, each person or entity constituting  a Maker and all

endorsers, sureties and guarantors consent to any and all extensions of time, renewals, waivers, releases or modifications that may be granted by Payee with respect to the payment or other provisions of this Note, and to the release, surrender or exchange of the collateral or any part thereof, with or without substitution, and agree that additional Makers, endorsers, guarantors or sureties may become parties hereto without notice to them and without affecting their liability hereunder. Any pledge, security interest or mortgage which secures the obligations evidenced hereby shall remain in full force and effect notwithstanding any such extension, renewal, waiver, release, modification, surrender, exchange or substitution.  Payee shall not be bound to take any steps necessary to preserve any rights in any property held as security herefor against prior parties, which Makers hereby assume to do, and these provisions shall apply and be controlling as to all property which may at any time be security for this Note.

5.      **Choice** of **Laws; Venue and Miscellaneous**.  This Note shall be construed in accordance with the laws of the State of Colorado.  At Payee's election, the Federal and state courts located in Boulder County, Colorado exclusively shall have venue to render a judgment on claim(s) relating to this Note. Makers hereby submit to personal jurisdiction in the State of Colorado; waives any and all personal rights under the laws of any state or country to object to jurisdiction within the State of Colorado for the purposes of litigation to enforce this Note or any other document related to security for this Note, if any.  Nothing contained in this Note, however, shall prevent Lender from bringing any action or exercising any rights under this Note within any other state or country.  Makers' initiating such proceeding or taking such action in any state or country shall in no event constitute a waiver of the agreement contained in this Note that the laws of the State of Colorado shall govern the rights and obligations of the Makers and Payee under this Note or a waiver of the submission made in this Note by the Makers to personal jurisdiction within Boulder County, Colorado.  Makers agree that service of process may be made, and personal jurisdiction over Makers obtained, by serving a copy of the Summons and Complaint upon Makers at its address set forth in this Note in accordance with the applicable laws of the State of Colorado.  The proceeds represented by this Note have been used or will be used by Makers for commercial and business purposes, and no part thereof has been or will be used for personal, family or household purposes.

In agreeing to the foregoing paragraph, the parties agree that resolution of disputes in the courts described herein is convenient for the purpose(s) of this Note.  The parties further acknowledge that there are economic benefits to controlling the forum of any dispute and that those economic benefits are part of the consideration for this Note, that they have consulted an attorney or attorneys and fully understand that the parties may have other rights or defenses based on choice of law, venue selection, and/or personal jurisdiction, but the parties, nevertheless, voluntarily and knowingly elect to waive any and all such rights under, for and through this Note.

6.      **Payee's Rights.**  Payee shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Payee, and then only to the extent specifically set forth in the writing.  A

waiver as to one event shall not be construed as continuing or as a bar to or a waiver of any right or remedy as to a subsequent event. The remedies of Payee as provided in this Note and the warranties contained herein shall be cumulative and concurrent (and not exclusive), and may be pursued singly, successively or together at the sole discretion of Payee, and may be exercised as often as occasion therefore shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. Payee shall be entitled to recover all costs of collection and enforcement hereof after a default hereunder, including but not limited to, court costs and attorneys' fees, together with interest on any judgment obtained, at the Default Rate (or, if higher, at the rate provided for interest after judgment in the location where such judgment is obtained) until actual payment is made of the full amount due hereunder.

Makers agree that, to the extent that Makers make a payment or payments to Payee, which payment or payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to Makers or the estate, trustee, receiver thereof, or any other party, including without limitation any guarantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the obligations under this Note (or the parts thereof which have been paid, reduced or satisfied) shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred.

7. **Notice.** All notices or demands required or desired to be given under this Note shall be in writing and sent by either email or by registered or certified mail (postage prepaid, return receipt requested), or by overnight courier such as FedEx Express, addressed to Makers at the address set forth at the end of this Note or to Payee at the address set forth in the first paragraph hereof, or to such other address as any party may from time to time designate by written notice given to the other parties. Any notice given in accordance with the foregoing shall be deemed to have been given on the date upon which it is received after having been so transmitted. If transmitted by certified or registered mail, refusal thereof shall be deemed to be receipt.

8. **Gender, etc.** Whenever used, the singular number shall include the plural, the plural the singular, the use of any gender shall be applicable to all genders, and the words "Payee" and "Maker" shall be deemed to include the respective heirs, personal representatives, successors and assigns of Payee and Makers. In addition, if "Maker" is comprised of more than one person or entity, then each agreement, covenant, representation, warranty, condition and provision shall apply to and be binding upon each constituent person or entity comprising Makers without regard to any liability, defenses, acts or omissions relating to any other person or entity comprising Makers, and each individual and entity comprising or constituting Makers shall be jointly and severally liable for all agreements, covenants, representations, warranties, condition and provisions hereof.

9.  **Miscellaneous.**  Time is strictly of the essence of the payment provisions and all other provisions of this Note.  Payee may assign or otherwise negotiate this Note.  The term "Payee" as used herein will mean any holder in due course. The captions of sections of this Note are for convenient reference only and will not affect the construction or interpretation of any of the terms and provisions set forth in this Note. This Note may not be amended, extended, renewed or modified, nor will any waiver of any provision hereof be effective except by an instrument in writing executed by an authorized officer of Payee.  Any waiver or any provision hereof will be effective only in the specific instance and for the specific purpose for which given. In case one or more of the provisions herein contained shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Note shall be construed as if such invalid, illegal or unenforceable provisions had been modified and limited to the extent and only to the extent necessary to render the provision valid and enforceable. In no event shall any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law and if any such payment is paid by the Makers, then such excess sum shall be credited by the Payee as a payment of principal.  No provision hereof shall effect or impair the absolute and unconditional obligation of the Makers to pay the principal hereof and interest hereon as herein provided without any abatement, diminution, postponement or deduction and without any reduction for counterclaim or setoff.   In the event that at any time any payment received by Payee hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Makers and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

10.      **Enforcement.**  Each Maker and each endorser and guarantor hereof hereby irrevocably authorizes any attorney at law, including any attorney retained by the holder of this Note, to appear for each Maker and each endorser and guarantor hereof in any court of record in the State of Colorado or any other state or territory of the United States after this Note becomes due, whether or not by acceleration, and admit the maturity of this Note and waive the issuing and services of process and confess judgment against each Maker and/or endorser and/or guarantor in favor of the holder of this Note for the amount then appearing due and cost of suit and thereupon to waive and release all errors, rights of appeal and review and stay of execution.   Each Maker and each endorser and guarantor agrees and consents that the attorney confessing judgment on behalf of each Maker and/or endorser and/or guarantor hereunder may also be counsel to the holder of this Note, and each Maker and/or endorser and/or guarantor hereby further waives any conflict of interest which might otherwise arise and consents to the holder of this Note paying such confessing attorney a legal fee.  A copy of this Note, certified by the holder of this Note, may be filed in each proceeding in place of filing the original as warrant of attorney.

**IN WITNESS WHEREOF**, the Makers has caused this Note to be executed in its name at the place and on the date and year first above written.

**Walking Candy Inc.**

Signed: *Sabudh Nath*
_____

Name: Sabudh Nath

Title: President

Business Address: 270 W 38th St Apt 12-A New York, New York

EIN: 462337765
_____

**Sabudh Nath**

Signed: *Sabudh Nath*
_____

Name:  Sabudh Nath

Address: 8675 PALO ALTO ST
JAMAICA, NY 11423-1203

SSN: 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
_____



# Audit Trail

Document ID: 50a8771a-423c-4779-ab22-d7b32d94382c

## Signer

## Signature

Email: wearjazzmusic@yahoo.com
IP Address: 73.231.138.176

*Sabudh Nath*

Email: wearjazzmusic@yahoo.com
IP Address: 73.231.138.176

*Sabudh Nath*

| Event | User | Time | IP Address |
|---|---|---|---|
| Upload document | sales@kickfurther.com | 1/31/17 6:38:36 PM EST | 97.118.100.29 |
| Open document | sales@kickfurther.com | 1/31/17 6:40:36 PM EST | 97.118.100.29 |
| Close document | sales@kickfurther.com | 1/31/17 6:41:35 PM EST | 97.118.100.29 |
| Close document | sales@kickfurther.com | 1/31/17 6:41:36 PM EST | 97.118.100.29 |
| Open document | sales@kickfurther.com | 1/31/17 6:50:28 PM EST | 97.118.100.29 |
| Close document | sales@kickfurther.com | 1/31/17 6:50:54 PM EST | 97.118.100.29 |
| Invite signer | sales@kickfurther.com | 1/31/17 6:51:16 PM EST | 97.118.100.29 |
| Open document | wearjazzmusic@yahoo.com | 1/31/17 8:14:26 PM EST | 73.231.138.176 |
| Sign document | wearjazzmusic@yahoo.com | 1/31/17 8:20:43 PM EST | 73.231.138.176 |
| Close document | wearjazzmusic@yahoo.com | 1/31/17 8:20:45 PM EST | 73.231.138.176 |
| Download document | sales@kickfurther.com | 1/31/17 10:30:47 PM EST | 50.170.170.131 |